**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John KHANDJIAN, Defendant-
Appellant.**

**No. 73-1428.**

United States Court of Appeals,
Fifth Circuit.

Feb. 6, 1974.

Theodore J. Sakowitz, Asst. Fed. Public Defender, J. V. Eskenazi, Federal Public Defender, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., J. Daniel Ennis, Harold F. Keefe, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

AINSWORTH, Circuit Judge:

This case arose from the discovery of a shortage of $320 in bank funds at the Pan American Bank of Miami Beach on August 28, 1972. The bank's head teller, John Khandjian, was subsequently indicted for and convicted [1] by a jury of embezzling the missing funds, in violation of 18 U.S.C. § 656.[2] Finding that there was neither proof of the commission of a crime nor independent evidence of a crime to corroborate a purported confession made by Khandjian, we reverse.

Khandjian, who had 12 years' banking experience, had been head teller of the Pan American Bank of Miami Beach for the four months it had been opened when one of the tellers, Mrs. Spungin, requested a supply of currency from him on August 28, 1972. She found one of

---

1. Defendant was immediately thereafter sentenced by the trial court to imprisonment for 18 months, his counsel's request for a presentence investigation being denied.

2. 18 U.S.C. § 656 reads in pertinent part:

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both; . . . .

the packets of twenty-dollar bills "short" by $320. According to her testimony at trial, this packet was one which she had made up on July 17, 1972. She stated that on that date she placed 50 twenty-dollar bills in the packet and marked it with her teller's stamp and her initials. She did not explain how she could identify it as the July 17 packet when she received it on August 28. She advised Khandjian of the shortage, and he replied that he could not understand how it could have happened, and that he would have to report it to the bank's chairman of the board, which he promptly did. The only discrepancy between Spungin's and Khandjian's recollection of this event developed at trial when Spungin testified that Khandjian brought her all of the currency she requested in one trip. Khandjian testified that her request included 10 trays of coins, that the order was too heavy to carry in one trip, that he brought the remainder to her in a second trip, and that she informed him of the shortage when he delivered the balance to her. After Khandjian reported the shortage, bank officials asked him, Spungin, and another bank employee to take a lie detector test, which they agreed to do. The bank arranged for these tests with a private security firm which it employed.

Khandjian was sent to take the polygraph test in the afternoon of August 28. The test was administered to him by one Bierman, who asked him to return the next day for another polygraph test. When Khandjian returned on August 29, Bierman took him into a room which did not contain any testing equipment. He stated that the tests of the other two bank employees were good, and that Khandjian had lied and was guilty of stealing $320 from the bank. An FBI agent, however, testified that Bierman had told him that Khandjian was too nervous for Bierman to "run an effective test on him." Bank official Potter testified that Bierman told him that Khandjian's test was "inconclusive." Bierman accused Khandjian of stealing the missing $320. Beginning with Khandjian's statement, made earlier to the bank officials and to Bierman, that he felt "responsible" for the missing money because it was under his charge since he was head teller, Bierman eventually obtained a confession from Khandjian. Bierman asked questions and suggested answers; when he received an affirmative response or gesture from Khandjian, Bierman had his secretary type up the answer as Khandjian's own response. Because the confession is the only evidence against Khandjian, and because the circumstances in which the confession was given were strongly disputed, we have included in the margin portions of the relevant trial testimony.[3]

---

3. The following was elicited on direct examination of Khandjian:

A He said, he told me, sir, that if I made the statement that I took the money, everything will be straightened out and that all I had to do was go back and pay the $320, the bank will be satisfied, the bonding company will be satisfied, and I could still stay there and hold my job.

Q What did he tell you about the disposition of any written statements?

A He said that the written statement that I had signed would not be seen by anyone other than himself and would stay in his office as such.

Q Did he tell you this before you made the statement?

A He told me that before and after.

Tr. 131

A Sir, when he told me that I am the one that took the money, that I stole it—his exact words—and I know I didn't take it—I was completely unnerved. I couldn't think straight. I was scared stiff. I never was involved in court in my life. But since he made this assurance that if I made the statement that I had taken the money and if I make it good, everything will be straightened out, I'll still continue working at the bank and there will be no charges against me, I had nothing to lose but to satisfy his request and satisfy his request [sic] and to get off—to get away from this case completely and finish it right then and there.

Q Were you frightened of him, sir?

A Frightened? I was petrified, sir. I couldn't think clearly.

Spungin testified that on the morning she received the "short" packet of twenties, she did not know how many loose twenties she had in her cash drawer. She also testified that she had had a shortage in her accounts once before during the preceding three or four months, amounting to $100.

Bank official Potter testified in response to the question, "Are shortages common or uncommon in the banking business?" that "They happen." He testified that he knew of other instances of shortages, and that except for the question of the missing $320, Khandjian's account was correct "to the penny." When asked, "Were there any discrepancies in the accounts of the other tellers during this period?" [of Khandjian's employment], he replied, "Yes. There are always shortages and overages in teller's accounts." He further stated that Khandjian handled $150,000 to $200,000 every day, and that on August 29, he had over $200,000 in his account. He said that the thrust of Khandjian's statements after returning from Bierman's on August 29 was his concern for keeping his job, and that Khandjian had offered several times before seeing Bierman to restore the money because it was found missing from his account.

Tr. 12

Q  Why did you sign the statement?

A  Sir, as I say, I was unnerved. The threat of losing my job, and a man of my age, it's hard to get a job.

Q  How old are you, sir?

A  I am 56 years old. And that is all I know, is banking, and if that is satisfying and since I had told Mr. Potter that I don't know how that $320 is missing or I can't explain it, I'm not accusing anybody. But since it was in my possession, I'm willing to make good. I have nothing to lose other than that. But I signed that statement and I'll give the $320 and still hold my job.

Q  When did you make this offer to Mr. Potter? Was it before or after you went to Mr. Bierman's office?

A  Before, sir.

Q  Did you tell Mr. Bierman that you had offered to repay the money?

Tr. 132

A  Mr. Bierman had known that.

Tr. 133

Two FBI agents testified that Khandjian, who had contacted them subsequent to the Bierman confession, had insisted that despite the confession, he had not taken the missing $320, and had offered to take any type of test, including truth serum.

Khandjian testified that he had no way of knowing whether Mrs. Spungin's "short" packet was in fact the same packet he had given her on the morning of August 28. He further testified that on returning to the bank after the confession to Bierman, he talked to bank officials, and they had him sign a blank promissory note, although he had been under the impression that he was to sign a valid note for $320.

We first consider proof of the corpus delicti with regard to the admissibility of the confession. The 1940 case of Pon Wing Quong v. United States, 9 Cir., 1940, 111 F.2d 751, 756 stated: "It is, of course, settled that the confession cannot be admitted until the corpus delicti has been established." However, the Ninth Circuit repudiated this statement as "dictum" three years later in Gros v. United States, 9 Cir., 1943, 138 F.2d 261, 264.[4]

██ Although we have found no discussion in this circuit of the policy con-

---

4. This question is considered in Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U.Pa.L.Rev. 638 (1955) at 657–658. There it is stated that

Although most courts say that independent proof of the corpus delicti should precede the introduction of the confession [footnote omitted], a reversal of the order of proof, provided sufficient independent proof is introduced at some point does not constitute reversible error. [Footnote omitted.]

There are certain dangers inherent in a rule which permits the confession to be used to help prove the corpus deliciti. One psychologist maintains that knowledge of a confession produces powerful suggestive influences for judges, witnesses, experts, and all concerned in the case. . . . Although it would be impossible to eliminate this danger completely, the risk can be minimized by requiring that the corpus delicti be proved without the aid of the defendant's confession, and that the confession not be admitted until the requirement of independent proof is satisfied.

siderations involved in proof of the corpus delicti before admission into evidence of the confession, the rule developed by our cases is that the confession can be introduced before the corpus delicti has been proved, but there must be proof at some stage of the trial that a crime has in fact been committed. While the following Fifth Circuit cases discuss the order of proof, each case makes clear that there must be proof of the commission of a crime.

In Moll v. United States, 5 Cir., 1969, 413 F.2d 1233, 1238–1239, appellant argued that the corpus delicti was required to be proved before the Government could offer his confession into evidence. We said, "The law is well settled to the contrary. It is sufficient if the independent evidence, together with the confession, establishes guilt beyond a reasonable doubt."

In Caster v. United States, 5 Cir., 1963, 319 F.2d 850, 852, cert. denied, 376 U.S. 953, 84 S.Ct. 972, 11 L.Ed.2d 973, appellant contended that his confession could not be admitted until the corpus delicti was proved by sufficient independent evidence. We responded to this contention that "To prove the corpus delicti of an offense, by evidence independent of the confession, the Government need only prove *that the offense in question likely has been committed.*" [Emphasis added.]

In Vogt v. United States, 5 Cir., 1946, 156 F.2d 308, 311, we said: "These confessions by the Defendants were admissible provided there was also in evidence such extrinsic corroborating facts and circumstances as would justify a jury *in finding that the alleged crime had been committed by someone.*" [Emphasis added.] Clearly, such a finding is prerequisite to a conviction.

In Masse v. United States, 5 Cir., 1954, 210 F.2d 418, 420, cert. denied, 347 U.S. 962, 74 S.Ct. 711, 98 L.Ed. 1105, the admission of Masse's confession was challenged on the ground that the Government had not first laid the predicate for its admission by proving the corpus delicti. Although there must be proof of the corpus delicti at trial, we held that that proof is not required to be made prior to the admission of the confession.

While we said in Landsdown v. United States, 5 Cir., 1965, 348 F.2d 405, 409, that "It is thus a sound principle that requires incriminatory statements of questionable reliability made outside the presence of a judge to be corroborated by substantial, independent evidence before their admission into evidence against the accused," we did not require that order of proof.

Smith v. United States, 348 U.S. 147, 153–154, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954), involved the crime of tax evasion, in which "there is no tangible injury which can be isolated as a corpus delicti." The Supreme Court stated: "The corroboration rule, at its inception, served an extremely limited function. In order to convict of serious crimes of violence, then capital offenses, independent proof was required that *someone* had indeed inflicted the violence, the so-called *corpus delicti.*" *Id.* We understand the Supreme Court to have said that the existence of the corpus delicti must be proved, and that the accused's confession alone is not sufficient proof, when it said at 348 U.S. 157, 75 S.Ct. 200 n. 4: ". . . where a fact is sufficiently important that the Government adduces extrajudicial statements of the accused bearing on its existence, and then relies on its existence to sustain the defendant's conviction, there is need for corroboration. . . ."

The Supreme Court also said in Wong Sun v. United States, 371 U.S. 471, 489, 83 S.Ct. 407, 418 n. 15, 9 L.Ed.2d 441 (1963): "Where the crime involves physical damage to person or property, *the prosecution must generally show that the injury* for which the accused confesses responsibility *did in fact occur, and that some person was criminally culpable.* . . ." [Emphasis added.]

The preceding cases indicate that there is no requirement that the corpus

delicti be proved before the defendant's confession can be admitted into evidence, but that the corpus delicti—the fact that a crime was committed—must be proved at trial, and that the defendant's confession alone is not sufficient proof of the corpus delicti.

It is settled law in this country that a conviction cannot be based on the uncorroborated confession of the accused.[5] The Supreme Court stated in Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941):

> The rule requiring corroboration of confessions protects the administration of the criminal law against errors in convictions based upon untrue confessions alone.

The Supreme Court further discussed the corroboration requirement in Opper v. United States, 348 U.S. 84, 89–90, 75 S.Ct. 158, 162–163, 99 L.Ed. 101 (1954):

> In the United States our concept of justice that finds no man guilty until proven has led our state and federal courts generally to refuse conviction on testimony concerning confessions of the accused not made by him at the trial of his case. Wigmore, Evidence (3d ed.), § 2071. See Warszower v. United States, . . . . In our country the doubt persists that the zeal of the agencies of prosecution to protect the peace, the self-interest of the accomplice, the maliciousness of an enemy or the aberration or weakness of the accused under the strain of suspicion may tinge or warp the facts of the confession. Admissions, retold at a trial, are much like hearsay, that is, statements not made at the pending trial. They had nei-

ther the compulsion of the oath nor the test of cross-examination. . . . [Footnote omitted.]

The purpose of requiring corroboration of confessions is also set forth in Smith v. United States, 348 U.S. 147, 152–153, 75 S.Ct. 194, 197, 99 L.Ed. 192 (1954):

> The general rule that an accused may not be convicted on his own uncorroborated confession has previously been recognized by this Court, Warszower v. United States, . . . ., and has been consistently applied in the lower federal courts . . . its foundation lies in a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused. Confessions may be unreliable because they are coerced or induced, . . . caution is warranted because the accused may be unable to establish the involuntary nature of his statements. Moreover, though a statement may not be "involuntary" within the meaning of this exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past. Finally, the experience of the courts, the police and the medical profession recounts a number of false confessions voluntarily made, Note, 28 Ind.L.J. 374. These are the considerations which justify a restriction on the power of the jury to convict, for this experience with confessions is not shared by the average juror.

5. For the history of the rule and a collection of early English and American cases, see Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U.Pa.L.Rev. 638 (1955). The Supreme Court explicitly recognized the rule in Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 606, 85 L.Ed. 876 (1941). The requirement of corroboration of confessions has been considered in several Supreme Court decisions, and is dealt with at length in Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954) and Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954). See also United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202 (1954); Wong Sun v. United States, 371 U.S. 471, 488–489, 83 S.Ct. 407, 418, 9 L.Ed.2d 441 (1963).

*Smith* discusses the quantum of corroboration necessary to substantiate the existence of the corpus delicti, and requires that there be "substantial independent evidence that the offense has been committed," and that "the evidence as a whole proves beyond a reasonable doubt that defendant is guilty." Further,

All elements of the offense must be established by independent evidence or corroborated admissions, but one available mode of corroboration is for the independent evidence to bolster the confession itself and thereby prove the offense "through" the statements of the accused.

348 U.S. at 156, 75 S.Ct. at 199.

The Supreme Court further stated in *Opper v. United States,* 348 U.S. 93, 75 S.Ct. 164–165:

[W]e think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti.* It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. *Smith v. United States,* 348 U.S. 147, 75 S.Ct. 194, [99 L.Ed. 192.]. It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of

their truth. Those facts plus the other evidence besides the admission must, of course, be sufficient to find *guilt beyond a reasonable doubt.*

This circuit has long recognized the requirement of independent corroboration of confessions. We said in *Flower v. United States,* 5 Cir., 1902, 116 F. 241, 247, that "A conviction cannot be had on the extrajudicial confession of the defendant, unless corroborated by proof aliunde of the corpus delicti." [6]

*Flower v. United States, supra,* involved the conviction of a bank teller for embezzlement of bank funds. Flower appealed his conviction on the basis that there was insufficient evidence of the corpus delicti outside of his confession. In that case, Flower admitted to bank officials and others that he had taken $36,000 in bank funds. In a letter to a bank patron, from whom Flower sought to borrow $36,000 to cover the missing money when his account was to be audited, and in conversations with bank personnel, Flower admitted that he switched a $4,000 label on a money packet to a $40,000 label, although the packet in fact contained only $4,000. The $36,000 was found to be missing from Flower's account during the six-month period between bank audits. Evidence independent of Flower's confession showed that a $4,000 label had been switched to a $40,000 label on a packet Flower handled in the presence of another bank employee, and that the packet in fact contained only $4,000. There was also evidence that $36,000 was missing from Flower's account, and that Flower

---

6. *See also* United States v. Abigando, 5 Cir., 1971, 439 F.2d 827, 832–833; United States v. Seckler, 5 Cir., 1970, 431 F.2d 642, 643–644; Moll v. United States, 5 Cir., 1969, 413 F.2d 1233, 1238–1239; Mills v. United States, 5 Cir., 1967, 380 F.2d 335, 336; Landsdown v. United States, 5 Cir., 1965, 348 F.2d 405, 409; Caster v. United States, 5 Cir., 1963, 319 F.2d 850, 852, cert. denied, 376 U.S. 953, 84 S.Ct. 972, 11 L.Ed.2d 973; Andrews v. United States, 5 Cir., 1962, 309 F.2d 127, 129, cert. denied, 372 U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970; Belvin v. United States, 5 Cir., 1960, 273 F.2d 583, 585, cert. denied, 372 U.S. 922, 83 S.Ct. 737, 9 L.Ed.2d 726; French v. United States, 5 Cir., 1956, 232 F.2d 736, cert. denied, 352 U.S. 851, 77 S.Ct. 73, 1 L.Ed.2d 62; Masse v. United States, 5 Cir., 1954, 210 F.2d 418, 420, cert. denied, 347 U.S. 962, 74 S.Ct. 711, 98 L.Ed. 1105; Vogt v. United States, 5 Cir., 1946, 156 F.2d 308, 310–311.

had sent a total of $36,000 to an investor in New York during the preceding six months. We found sufficient corroboration in this evidence to sustain Flower's conviction.

 In the instant case, the trial testimony showed that a teller working under Khandjian was short $320; she had had a shortage in her account in the recent past; other bank tellers have had shortages; Khandjian handled $150,000 to $200,000 every day, and his account had always balanced out; there was no way of knowing whether the packet Khandjian delivered to Spungin was the same packet which she showed to be short, nor that it was delivered to her short, other than her word. It was never shown that the bank had in fact lost $320, nor that the $320 missing on the morning of August 28, 1972, was stolen from the bank. Outside of Khandjian's confession, no evidence has been adduced to indicate that the crime of embezzlement was committed.

In the instant case, the only evidence that a crime was committed and that Khandjian was guilty thereof is the confession to Bierman. Khandjian's conviction cannot stand since the confession is not corroborated by any independent evidence. This case exemplifies the soundness of the rule requiring substantial independent evidence that an offense has in fact been committed and evidence from which the jury may find the accused guilty beyond a reasonable doubt, because the confession and the circumstances in which it was made strongly imply that Khandjian was induced to confess to a criminal act which he did not commit; indeed, there may have been no crime committed at all.

Defendant's motion for judgment of acquittal made following the Government's case, and renewed thereafter at the close of all the evidence, and again after the verdict, should have been granted by the trial judge, and it was error to deny the motion.

Reversed.