UNITED STATES of America,
Plaintiff-Appellee,

v.

Amalia OLIVARES, Defendant-
Appellant.

No. 73–4021.

United States Court of Appeals,
Fifth Circuit.

June 21, 1974.

Joseph A. Calamia, John L. Fashing, El Paso, Tex., for defendant-appellant.

William Sessions, U. S. Atty., San Antonio, Tex., Ralph Harris, William B. Hardie, Jr., Ronald F. Ederer, Asst. U. S. Attys., El Paso, Tex., for plaintiff-appellee.

Before TUTTLE, COLEMAN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Amalia Olivares was convicted, after a trial to the district court, on six counts of knowingly transporting aliens know-

ing them to be in the United States illegally, in violation of 8 U.S.C. § 1324.[1] We find that the search forming the basis of her conviction was conducted without probable cause; and we reverse.

In the district court the parties stipulated, in effect, that, if the six aliens named in the indictment were called as witnesses, they would testify to events constituting the substantive elements of the offenses charged against defendant.[2]

1. The statute provides:

§ 1324. Bringing in and harboring certain aliens; persons liable; and authority to arrest

(a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry into the United States of—

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal

The stipulation was, however, subject to defendant's motion to suppress all evidence, and the fruits thereof, obtained as a result of the search of the vehicle in which defendant was transporting the aliens. After hearing the testimony relevant to the motion to suppress, the district court denied the motion, and the stipulation was admitted. The facts pertinent to this appeal are not in dispute.

practices incident to employment) shall not be deemed to constitute harboring.

(b) No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, and all other officers whose duty it is to enforce criminal laws.

2. The stipulation reads in pertinent part:

"That on or about October 13, 1973, they met the defendant AMALIA OLIVARES at the Hotel Los Pinos in Juarez, Chihuahua, Mexico; that they all had a conversation with her and at which time she proposed to them to bring them into the United States for the sum of $200.00 each. They further agreed that for this sum they would be transported to Chicago, Illinois. The witnesses for the Government would further testify that defendant knew that they were Mexican citizens and not entitled to enter into the United States because she was advised by them that they did need someone to help them to come into the United States. The witnesses as named would further testify that she led them up the river to a point near Ysleta, Texas, at which time she led them across the river into a waiting truck. That they proceeded to get into the truck and that she was the driver. That she proceeded to transport them within the United States at which time they were stopped by officers of the Sheriff's Department near Clint, Texas. The witnesses for the Government as named about would further testify that they are citizens of the republic of Mexico, that they were here in the country, in the United States, on the date alledged [sic] on the indictment against AMALIA OLIVARES illegally and that they had not been duly admitted by an Immigration officer of the United States and they were not lawfully entitled to enter and to reside within the United States and that AMALIA OLIVARES well knew this to be true."

## I.

At 4:15 a. m. on October 13, 1973, Constable Jesus R. Cano, who was employed by the County of El Paso to work with law enforcement officers in the area of Fabens, Texas, noticed a heavily loaded Ford Econoline Van moving slowly up a slight incline in front of the Texaco service station about a mile from Fabens. The van was spotted by Constable Cano on the access road leading to Interstate 10, as the van was coming north from Fabens and heading toward El Paso. At this point, the van was approximately four or five miles from the border with Mexico. Constable Cano knew from his experience with narcotics and alien smuggling in the Fabens area that vehicles similar to this van were used for such smuggling. The fact that this van was on the road at 4:15 a. m. also aroused his suspicions.

About ten minutes after the van passed, Constable Cano happened to meet Deputy Sheriff Bobby C. Deffers of the El Paso County Sheriff's Department and informed him that a van with an exceptionally heavy load had entered the highway going west. Constable Cano suggested that Deputy Deffers stop the van and check it out.

In his twenty-one months with the El Paso Sheriff's Department, Deputy Deffers had experience in detecting the smuggling of marijuana and illegal aliens. In addition, he was aware that there had been problems in the area with smuggling and burglaries and that van-type vehicles had been used for these purposes. So he proceeded on to Interstate 10. When he located defendant's vehicle, he noticed that the van was riding a "little low in the rear," as though it were carrying a load, that the rear windows of the van were blocked, and that the van had out-of-state license plates. Deputy Deffers turned on his emergency lights, and, after defendant pulled over to the side of the road, Deffers notified his dispatcher that he was making a routine traffic check.[3] Deputy Deffers walked up to the van and asked defendant for identification, whereupon she produced a valid Illinois driver's license. At this point, he noticed a passenger sitting in the front seat—"what appeared to be a Mexican male." Deputy Deffers asked the passenger for identification. Though the reply was in Spanish and Deputy Deffers did not understand Spanish, the passenger apparently indicated that he had no identification. Deputy Deffers next inquired as to the passenger's home, and to this the passenger replied, "Mexico." From his position, Deputy Deffers could not see to the rear of the inside of the van because a blanket, which hung behind the two front seats, blocked his

3. We note the following exchange between defendant's counsel and Deputy Deffers concerning Deputy Deffers' practices with respect to van-type vehicles:

Q How many [vehicles similar to this van] have you stopped for checking them out because they—for any reason, this type of vehicle, how many times have you stopped them and searched them as you say, to check them out in your 21 months period.

A Two or three times a week, at least.

Q This type of vehicle, referring to this

A —yes sir, closed van or a truck.

Q Any type of closed van, you consider this type of vehicle suspicious?

A Yes, sir.

Q So you make it your business that when you see an enclosed Van in the neighborhood of El Paso and Clint and Fabens, on the freeway, and it is enclosed, you want to know what is in it, is that correct?

A It would depend on the circumstances.

Q All right sir. And if the circumstances were such that it was loaded down, that is when you want to look into it, or in the early morning hours?

A If it is a strange vehicle to that area, yes sir.

Q You mean out of state license?

A Out of state license or a strange vehicle to that area?

Q You mean a vehicle not known in this area?

A Or known to the officers in that area, yes, sir.

view. Deputy Deffers asked defendant what was in the back of the van, to which she replied that there were two mattresses. He then asked defendant to open the van, which she did, and eighteen to twenty males and females were found inside. When these individuals were asked to produce proper identification permitting them to be in this country and were unable to do so, they were detained, and the Border Patrol was notified. After transporting the individuals to the Texaco service station, Deputy Deffers and the Border Patrol searched them for weapons and narcotics and found none.[4]

## II.

■ It is settled, of course, that a moving vehicle may be stopped and searched without a warrant where there is probable cause for the search. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Almeida-Sanchez v. United States, 413 U.S. 266, 269, 93 S.Ct. 2535, 2537–2538, 37 L.Ed.2d 596 (1973); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L. Ed.2d 419 (1970); Carlton v. Estelle, 5 Cir., 1973, 480 F.2d 759, cert. denied, 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d

334.[5] The Government contends that probable cause for the warrantless search of defendant's van is furnished by viewing, as we must, these circumstances as a whole:[6] the van was riding low because it was carrying a heavy load; the van was moving in a direction away from the border; the van was spotted at 4:15 a. m.; the van bore out-of-state license plates; the rear windows of the van were blocked; and the officers were aware of a high incidence of marijuana and alien smuggling in the Fabens area.[7] See, e. g., United States v. Lopez-Ortiz, 5 Cir., 1974, 492 F.2d 109; United States v. Doyle, 5 Cir., 1972, 456 F.2d 1246. We realize that we must deal not with technicalities but with probabilities associated with the everyday practical considerations of reasonable men. See Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). We cannot say, however, that the facts and circumstances within the officers' knowledge in this case would "warrant a man of reasonable caution in the belief that an offense has been or is being committed," Brinegar v. United States, supra at 175, 69 S.Ct. at 1310–1311; see Carroll v. United States, supra at 162, 45 S.Ct. at

---

4. After the group's return to the service station, Constable Cano was told by a service station attendant that the attendant had seen defendant's van on the preceding evening heading toward the border. This information was not within the officer's knowledge at the time of the search of the van, however, and is not considered in our determination of the probable cause question. See, e. g., Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–1311, 93 L. Ed. 1879.

5. The Government does not contend that this was a border search or its functional equivalent; nor does it contend that defendant consented to the search of her vehicle.

6. When evidence obtained as a result of a search and seizure by state law enforcement officers is offered in a federal prosecution, as in this case, it is well established that federal constitutional principles are to be

applied. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); United States v. West, 5 Cir., 1972, 460 F. 2d 374.

7. In its brief, the Government notes our recognition "that a police officer may stop a vehicle and request the production of a driver's license with somewhat less than probable cause as a requisite," Dell v. State of Louisiana, 5 Cir., 1972, 468 F.2d 324, 326, cert. denied, 411 U.S. 938, 93 S.Ct. 1904, 36 L.Ed.2d 400 (1973); see United States v. Pearson, 5 Cir., 1971, 448 F.2d 1207, 1212, and suggests that the dispositive issue in this case is whether a stop of the van and a brief detention was based on a reasonable suspicion of criminal activity, see, e. g., Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed. 2d 612 (1972). In this case, however, we do not deal with a stop accompanied by a limited inquiry for routine investigative purposes.

288; Stacey v. Emery, 97 U.S. 642, 645, 24 L.Ed. 1035, 1036 (1878). Tested by objective standards, *see, e. g.,* Dodd v. Beto, 5 Cir., 1970, 435 F.2d 868, 870, the movements of this van did not give rise to a reasonable belief that criminal activity was afoot. Driving a loaded van with out-of-state plates in the early morning hours, heading west from Fabens toward El Paso, does not create a reasonable inference of criminal activity. The situation is not, moreover, turned into a basis for probable cause merely because there was a high incidence of smuggling in the area. *Cf.* Sibron v. State of New York, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968).

█ Most of the circumstances offered by the Government in support of probable cause came into play before Deputy Deffers stopped defendant's van. If subsequent events are also considered, however, no adequate basis for the search is apparent. Although Deputy Deffers reported to his dispatcher that he was making a routine traffic check, he testified that no traffic violation was involved in his stopping the vehicle. When asked for identification, defendant produced a valid Illinois driver's license; and she explained that the van was riding low because there were two mattresses in the rear. That defendant's passenger in the front seat was from Mexico, coupled with other facts set forth above, is still insufficient to establish that probable cause existed. *See* United States v. Mallides, 9 Cir., 1973, 473 F.2d 859, 860.

There being no probable cause for the search of defendant's van, the search violated defendant's Fourth Amendment right to be free of "unreasonable searches and seizures." Accordingly, since the evidence obtained as a result of the search should have been excluded by the district court, defendant's conviction is

Reversed.