**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**George Michael FRISBIE,
Defendant-Appellee.**

No. 76–2176.

United States Court of Appeals,
Fifth Circuit.

April 11, 1977.

Rehearing and Rehearing En Banc
Denied June 13, 1977.

John E. Clark, U.S. Atty., Robert S. Bennett, Asst. U.S. Atty., San Antonio, Tex., William F. Sheehan, III, Richard A. Allen, Attys., Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Joseph Sib Abraham, Jr., Charles Louis Roberts, El Paso, Tex., for defendant-appellee.

Before GODBOLD, SIMPSON and GEE, Circuit Judges.

SIMPSON, Circuit Judge:

Defendant-appellee George Michael Frisbie was indicted for violations of Title 21, U.S.Code, Sections 952(a) and 841(a)(1), importing into the United States, and possessing, with intent to distribute, 2,951 pounds of marijuana. Frisbie pled not guilty to both counts, and moved to suppress the marijuana seized on the ground that it had been seized as the result of an unlawful search. Following an evidentiary hearing and submission of briefs, the district court granted defendant's motion to suppress and the United States appeals. We affirm.

## I. FACTS

On January 14, 1976, from midnight to 8:00 a. m., United States Border Patrolmen Nieto and Bonner were stationed at a cut-off road on State Highway 118, approximately 35 miles south of Alpine, Texas. Sometime between 6:30 a. m. and 7:00 a. m., they were notified by the radio operator at the Marfa, Texas Control Center that the Center had received a sequential pattern of signals from sensor devices located on Ranch Road 170 and State Highway 118 indicating that two vehicles were traveling east on Highway 170 from the area of the Mexican border and that one vehicle was traveling north, toward the officers, on Highway 118. The two highways intersect at Study Butte immediately west of the westerly entrances to Big Ben National Park,[1] about 15 miles from the Mexican Border, and 75 miles from Alpine. Shortly thereafter the sensor signals indicated that all three vehicles were headed north on Highway 118. The location of these vehicles indicated to the officers a substantial possibility that they were coming from an unpatrolled river area to the west on Highway 170. The patrolmen also testified that

---

1. The other entrance is from U.S. Highway 385, several miles to the northeast. The Park, located in Brewster County, Texas, has an area of 1100 square miles, and has complete tourist facilities, including cottages, camping ground, a restaurant, riding stables and a grocery store and gift shop.

Highway 118 was frequently used to transport aliens and contraband, and that the late evening and early morning hours were the prime times when these activities were conducted.

Patrolmen Bonner and Nieto stopped the first two northbound vehicles briefly to determine the citizenship of the occupants, and permitted them to proceed. While questioning the driver of the second car, they heard a third vehicle approaching. Nieto stepped onto Highway 118 and, with his flashlight, signaled the vehicle to stop. This proved to be a pickup truck with a box-type camper attached to the truck. While the truck was slowing down, Nieto noticed that it was riding low on its springs, and also that the driver was having difficulty stopping, causing the officer to believe that it was heavily loaded.

Nieto shone the flashlight on the driver's face. The driver's appearance led Nieto to believe that he was of Mexican-American descent. But questioning the driver, Frisbie, revealed that in fact he was an American citizen, though not a resident of the vicinity. Frisbie told Nieto also that he did not have a key to the camper, that it did not belong to him, and that no one was in it. Bonner then began to question Frisbie while Nieto walked to the back of the camper. Bonner testified that Frisbie appeared to be extremely nervous during the questioning.

Patrolman Nieto was not able to see into the camper because curtains were drawn across some of its windows and others were blackened. Nieto lowered the tailgate of the camper to determine, he testified, whether the door was in fact locked. After lowering the tailgate, Nieto noticed a small amount of marijuana on the truck, between the tailgate and the camper. He then raised the tailgate to its original position, returned to the front of the truck, and arrested Frisbie. After the arrest, Bonner saw traces of marijuana on the rear bumper. The agents lowered the tailgate a second time, tried the camper door and found it locked. The camper and Frisbie were taken to the Border Patrol Station at

Alpine, Texas. Search there of the camper turned up 2900 pounds of marijuana.

## II. THE STOP

To support the initial stop of defendant's vehicle by the border patrolmen, the government argues that such stop was justified by a reasonable suspicion on the part of the officers, pursuant to *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), that such vehicle was carrying illegal aliens. The officers based this reasonable suspicion on the following: the direction the vehicle was traveling, the likelihood that the vehicle was coming from an unpatrolled river area, the difficulty the driver had in stopping the vehicle, the sparsely populated area where the stop occurred, their knowledge that local traffic did not normally travel the roads in question at such early hours of the morning and that the route in question was frequently traveled by persons transporting illegal aliens and contraband, with such activity taking place primarily in the late evening and early morning hours. The district court upheld the initial stop of the vehicle "for the limited purpose of determining the occupant's citizenship". (Order Granting Defendant's Motion to Suppress, p. 3.)

In *Brignoni-Ponce,* two Border Patrol officers made a roving-patrol stop of respondent's vehicle solely because the three occupants appeared to be of Mexican descent. Respondent's two passengers were illegal aliens, and respondent was charged with illegally transporting aliens. Respondent sought to have the testimony of and about the two aliens suppressed at trial on the ground that it was the fruit of an illegal seizure. The trial court denied the motion and respondent was convicted. The Court of Appeals for the Ninth Circuit reversed. In affirming the appellate court, the Supreme Court stated:

"We are unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops. In the context of border area stops, the reasonableness requirement of

the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government. Roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well. San Diego, with a metropolitan population of 1.4 million, is located on the border. Texas has two fairly large metropolitan areas directly on the border: El Paso, with a population of 360,000, and the Brownsville-McAllen area, with a combined population of 320,-000. We are confident that substantially all of the traffic in these cities is lawful and that relatively few of their residents have any connection with the illegal entry and transportation of aliens. To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers."

Id. at 882, 95 S.Ct. at 2580–2581.

At the suppression hearing in the present case it was stipulated that the population of the two counties involved, Presidio and Brewster, totaled only 12,622 persons, that in 1975 the Big Bend National Park had 331,983 visitors, and that during the month of the search, January 1976, 34,178 persons visited the park. The sensor devices revealed the direction in which the traffic was traveling and the sparse amount of that traffic. We discern nothing to indicate that the sensor signals being received established a reasonable suspicion that the vehicles in question were transporting illegal aliens. Our approval of a stop of this nature, founded upon dubious "suspicious" circumstances of such slight import would result in subjecting the thousands of tourists visiting the area to unreasonable detention whenever they travel at hours when certain routes are less frequented. A decision to travel such roads at less busy hours should not be the difference—constitutionally speaking—determinative of the right of of-

ficers to stop vehicles. See *Brignoni-Ponce, supra*, 422 U.S. 873, 882, 95 S.Ct. 2574, 2580.

■ The district court attached significance to the Border patrolmen's observation of appellee's difficulty in braking his vehicle in finding grounds for reasonable suspicion. This circumstance was entitled to no weight since the observation occurred after the officer had signaled the vehicle to stop. See *United States v. Robinson*, 5 Cir. 1976, 535 F.2d 881, 883 fn. 2, where this court stated that a stop under the Fourth Amendment " . . . does not mean a physical stop but rather a restraint of movement." An observation made after and caused by a stop cannot be bootstrapped into grounds for reasonable suspicion warranting the stop. See id. at 884.

The district court ruled incorrectly when it found the presence of grounds for reasonable suspicion justifying the initial stop.

■ Of course the ensuing search of the camper-truck necessarily goes down with our ruling that the initial stop of the vehicle was unlawful. Hence this opinion might well end at this point with an affirmance, but, even if we have reached an unsound conclusion with respect to the right to stop the vehicle the trial court's suppression of the search should be affirmed. It seems to us prudent to explore that question fully, covering all contingencies raised by the appeal.

## III. THE SEARCH OF THE CAMPER

The facts surrounding the search of the camper-truck are fully set out above. Nothing in those facts considered separately or in their totality supports a finding of sufficient basis to search the vehicle.

■ Assuming arguendo the legality of the initial stop of the camper-truck, such a stop would allow the detaining officer to "question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, *but any further detention or search must be based on consent or probable cause.*" *Brignoni-Ponce, supra*, 422 U.S. at 881–882, 95 S.Ct. at 2580 (emphasis sup-

plied). The government does not argue that probable cause to lower the tailgate was present. Indeed, such an argument would be difficult to sustain. See *United States v. Olivares*, 5 Cir. 1974, 496 F.2d 657, 660–661, where the Court observed:

> We realize that we must deal not with technicalities but with probabilities associated with the everyday practical considerations of reasonable men. *See Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). We cannot say, however, that the facts and circumstances within the officers' knowledge in this case would "warrant a man of reasonable caution in the belief that an offense has been or is being committed," *Brinegar v. United States, supra* at 175, 69 S.Ct. at 1310–1311; *see Carroll v. United States, supra* [267 U.S.] at 162, 45 S.Ct. [280] at 288 [69 L.Ed. 543]; *Stacey v. Emery*, 97 U.S. 642, 645, 24 L.Ed. 1035, 1036 (1878). Tested by objective standards, *see, e. g., Dodd v. Beto*, 5 Cir., 1970, 435 F.2d 868, 870, the movements of this van did not give rise to a reasonable belief that criminal activity was afoot. Driving a loaded van with out-of-state plates in the early morning hours, heading west from Fabens toward El Paso, does not create a reasonable inference of criminal activity. The situation is not, moreover, turned into a basis for probable cause merely because there was a high incidence of smuggling in the area.

Rather, the United States argues that "minimal government intrusions", Appellant's Brief, p. 6, such as existed in this case are not unreasonable under the Fourth Amendment. In this connection, it is helpful to remember the language of *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746, 752 (1886):

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

The government relies on several Supreme Court cases for support that probable cause was not necessary for the lowering of the tailgate. It argues that "[t]he practical approach to the Fourth Amendment reflected in *Terry v. Ohio*, supra, 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889], *United States v. Brignoni-Ponce*, supra and *United States v. Martinez-Fuerte*, No. 74–1560 (Sup.Ct., [428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116] decided July 6, 1976), calling for a balancing of public and private interests responsive to the myriad of situations in which law enforcement officials and the citizenry come into contact, should govern this case and warrants reversal." These cases fail to support the holding urged upon us.

The holding of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to whatever slight extent it may apply here, is more restrictive than the position taken by the government. The Court stated in *Terry*:

> ". . . there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the

specific reasonable inferences which he is entitled to draw from the facts in light of his experience. . . .

"We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

Id. at 27, 30, 88 S.Ct. at 1883, 1884–1885. Certainly this "fear for one's safety" justification for a partial search is simply not involved here. No further comment seems required as to *Terry v. Ohio.*

*United States v. Brignoni-Ponce, supra,* specifically requires, as already noted, that any further detention or search, beyond questioning about citizenship or immigration status, be based on consent or probable cause. Neither was present in this case.

*United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) dealt with a stop at a permanent checkpoint which, the Court noted, differs from a roving-patrol stop. While random roving-patrol stops cannot be tolerated, "[r]outine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity." Id. at 559, 96 S.Ct. at 3083.

The government also relies on cases such as *Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), "The issue . . . is whether the examination of an automobile's exterior upon probable cause involves a right to privacy which the interposition of a warrant requirement is meant to protect. . . . Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment.", id. at 589, 595, 94 S.Ct. at 2468, 2472, *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), where the search was a caretaking search "of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action . . . ", id. at 447–448, 93 S.Ct. at 2531, and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), which is in the *Terry* genre of cases, i. e., the officers investigating had reasonable grounds to believe that the defendants were armed and were possibly dangerous.

We think it evident that reliance on all these cases is misplaced. See *United States v. Woodard,* 5 Cir. 1976, 531 F.2d 741.

■ The lowering of the tailgate by Border Patrolman Nieto was an infringement upon appellee's reasonable expectation of freedom from government intrusion, *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in violation of the Fourth Amendment. The marijuana discovered as a result of that search was fruit of the poisonous tree and as such not admissible in evidence. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The district court properly suppressed that evidence.

While the holding of the district court that the initial stop was legal was, in our view, incorrect, that court did not err in

granting the motion to suppress the evidence resulting from the search.

AFFIRMED.

GEE, Circuit Judge, concurring in part and dissenting in part:

I concur in the result and in all but Part III of the opinion. I dissent from Part III since it seems to me that, on its conditional assumption that what had gone before the search was valid, the officers had probable cause to search. And, of course, without such an assumption Part III is gratuitous.

By the time Officer Nieto dropped the tailgate and discovered the contraband, he knew a great deal: that the vehicle had come from a border area, probably uncontrolled, early in the morning; that it was in the position of "back door" in a convoy formation travelling a road frequently used to transport aliens and contraband; that the driver claimed to have no keys to the camper; that it was heavily loaded; that its windows were blacked out; and that the driver appeared extremely nervous during questioning. These factors make out probable cause. Indeed, considerably less has been held to do so in very similar circumstances, *United States v. Reyna*, 546 F.2d 103 [5th Cir., 1977].