**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Allan ALMAND,**
**Defendant-Appellant.**

**No. 77–5064.**

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1978.

Warren Burnett, Richard J. Clarkson, Odessa, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Ronald P. Guyer, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

James A. Almand was charged with possession of 550 pounds of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). He waived trial by jury, moved unsuccessfully to suppress the seized marijuana, and was convicted and sentenced. He asserts on appeal that no reasonable grounds existed for his initial interrogation by the Border Patrol, and that consent to the search of his parked camper was lacking. We find no merit in his contentions and affirm.

## I. FACTS

Around 6:00 a. m. on January 22, 1976, a Border Patrol radio operator at the Marfa, Texas, Control Center received signals in sequence from sensor devices located on Highway 170, near Study Butte, indicating that a vehicle was proceeding northeast through Big Bend National Park toward Highway 385. The radio operator notified Border Patrolman Wilson at his home in Alpine, Texas. The location of the vehicle and the time of day indicated to Wilson a possibility of alien smuggling from the unpatrolled river area to the southwest on Highway 170, a distance of about six miles from the first sensor. Wilson telephoned his fellow officer Smith, who agreed to accompany Wilson in an investigation. The officers drove down Highway 90 at speeds in excess of 100 mph, hoping to intercept the vehicle on Highway 385 a few miles south of Marathon, Texas. By maintaining contact with the radio operator, Wilson and Smith learned that the last sensor activated, no. 317, was some 35 miles south of Marathon on Highway 385 and that the other sensors north of no. 317 had not been tripped, leading Wilson and Smith to believe the vehicle had stopped or turned off the road.

As Wilson and Smith approached the area of sensor 317, they observed a pickup truck with overhead camper parked on the east side of the road facing south. The truck had Georgia license plates. Suspecting that this was the vehicle that had been traveling north from the border area, Officer Wilson felt the engine grill, and determined that the engine was warm, although the temperature was 22°F. His suspicion confirmed, Wilson knocked on the camper door, announced he was a Border Patrol officer, and asked if anyone was inside.

After some delay Almand opened the door, stepped out with his hands up, and closed the camper door behind him. He had a black eye, a cut under one ear, and a bruise on one hand. Officer Wilson, in uniform, with his revolver in its holster, stood nearest to Almand. Officer Smith, also in uniform and carrying a shotgun, stood 10 to 15 feet behind Wilson and to his side. In spite of Almand's assertion that Smith pointed the shotgun at him, the district court found that Smith kept it pointed toward the ground.

Officer Wilson identified himself as a Border Patrol officer and asked Almand his citizenship, place of birth, and where he had been. Almand replied that he was a U. S. citizen, born in Georgia, and that he had been traveling from Midland, Texas, south toward Big Bend National Park. In response to a question by Officer Smith, Almand claimed he had been parked at that

spot for slightly over two hours. Considering the warmth of the engine and the sequential sensor readings indicating that Almand's truck had been traveling north from the border, Officer Wilson testified that at this point he did not believe Almand was telling the truth. Officer Wilson asked if he was alone, and Almand answered affirmatively. Officer Wilson then asked Almand if he would mind Wilson looking inside the camper. According to Wilson's testimony, Almand agreed. Almand claims that without saying anything, he reached into his pocket, removed the key, unlocked the camper door, and opened it. From outside, Wilson observed several gas cans in the camper and a large mound in the center aisle covered with a blanket. Wilson stepped inside the camper and found several large plastic bags under the blanket. After feeling the bags, Officer Wilson pierced the plastic revealing the presence of marijuana. He then stepped back outside the camper and arrested Almand.

## II.  THE STOP

██  The initial interrogation of Almand, to be legitimate, must be distinguished from the admittedly similar stop in *United States v. Frisbie,* 550 F.2d 335 (5th Cir. 1977).[1] On oral argument the government conceded that Officer Wilson's intrusion constituted a stop within the scope of *Frisbie* and *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). That a stop under the Fourth Amendment ".  .  .  does not mean a physical stop but rather a restraint of movement," *United States v. Robinson,* 535 F.2d 881, 883 n.2 (5th Cir. 1976), is well settled. A stop occurred when Almand stepped out of the rear of the camper into the officers' presence.

Although the officers in *Frisbie* relied on signals from some of the same sensor devices that traced Almand, different circumstances supported the officers' decision to investigate in this case. The observations upon which the government sought to support the stop in *Frisbie* were made after the stop had begun. In that case Border Patrolman Nieto noticed that the truck was heavily loaded and that the driver was having difficulty stopping only as the truck was slowing down in response to his signal.

In the instant case Patrolman Wilson possessed considerable legitimately acquired information at the time he encountered Almand at the rear of the vehicle. In addition to sensor signals revealing the direction and sparse amount of traffic on Highway 385 at that time of day, Wilson knew that the vehicle he was investigating had stopped or turned off the highway. He was aware that sensor devices had indicated no southbound traffic along this stretch of Highway 385 that was not accounted for. After feeling the grill of the parked vehicle, Wilson was certain that it had only recently been parked. With these facts in mind, he asked Almand the standard questions relating to citizenship and his destination and point of departure. *See Brignoni-Ponce, supra,* 422 U.S. at 881–882, 95 S.Ct. at 2580, 45 L.Ed.2d at 616–617. Almand's answers to these questions were inconsistent with the information that Wilson had gathered. Almand stated he had been parked two hours; Wilson knew the vehicle had recently been driven. Almand stated he was coming from Midland, Texas, by way of Marathon; Wilson knew that the vehicle had not come from that direction and was reasonably certain that it had come from the unpatrolled border area.[2]

1.  The same District Judge who granted the motion to suppress in *Frisbie* denied the suppression motion in the instant case.

2.  The government summarizes the following facts which it claims are pertinent and supported by the record.

  The area where the truck was parked was sparsely travelled.  The trip originated near the

border where the Rio Grande could be crossed on foot or by vehicle.  The parked truck was observed early in the morning in an area where vehicles do not usually park.  The defendant refused to respond when first asked to open the door.  This was the only vehicle to activate the sensors since midnight.

■ Faced with responses that would necessarily arouse suspicion by their incongruity with the information he already possessed, Officer Wilson was authorized to investigate further. *Brignoni-Ponce, supra,* 422 U.S. at 881–882, 95 S.Ct. at 2580, 45 L.Ed.2d at 616; *United States v. Worthington,* 544 F.2d 1275, 1279–1280 (5th Cir. 1977). Nothing in *Frisbie* indicates that a law enforcement officer in these circumstances should curtail his inquiry.

## III. THE SEARCH

■ For the search of the camper to be lawful, Almand's consent must be shown, as no probable cause existed when Wilson asked Almand to open the camper door. *Cf. United States v. McCann,* 465 F.2d 147, 159 (5th Cir. 1972), *cert. denied sub nom., Kelly v. United States,* 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154 (1973). The district court, faced with conflicting testimony on the consent issue, rejected Almand's testimony where it diverged from the officers', because Almand became nervous and his testimony lost spontaneity and was self-contradictory and inconsistent. The district court found that Officer Smith did not point his shotgun at Almand and that Officer Wilson did not say to him "We don't like to shoot people." While the testimony of officers Wilson and Smith was not exactly identical, the district court found that, in response to Wilson's request to look inside the camper, Almand silently reached into his pocket, removed the key, and unlocked and opened the camper door. Based on these facts, the district court determined that consent was, in fact, freely and voluntarily given.

■ Almand testified that he did not know he had the right to refuse the officers' request to search his camper. The district court deemed that fact immaterial. Under *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854, 862 (1973), the absence of proof that the defendant knew he could withhold his consent, though a factor for consideration, is not of controlling significance in determining the voluntariness of consent. The district court found that the search of Almand's camper was conducted pursuant to Almand's voluntary waiver of his Fourth Amendment right. On the record before us, this decision must stand. *See United States v. Watson,* 423 U.S. 411, 424–425, 96 S.Ct. 820, 46 L.Ed.2d 598, 609–610 (1976).

■ Almand contends that Officer Wilson acted unreasonably in searching the covered plastic bags because they were not likely to contain illegal aliens. Courts have, for instance, suppressed the fruits of searches for aliens under automobile seats, *United States v. Winer,* 294 F.Supp. 731 (W.D.Tex.1969); in jacket pockets, *Roa Rodriguez v. United States,* 410 F.2d 1206 (10th Cir. 1969); and between the trunk panel and inside wall of an automobile, *Valenzuela-Garcia v. United States,* 425 F.2d 1170 (9th Cir. 1970). In the circumstances of this case, however, Officer Wilson acted reasonably in investigating further the 550 pound mass occupying the center of the floor of Almand's camper truck. He felt the contents of the bags before he opened them and suggested that he concluded that they did contain contraband. The officer had many years of experience as a Border Patrol officer.

Judgment AFFIRMED.

WISDOM, Circuit Judge, dissenting:

I respectfully dissent. In this case, as in *United States v. Villarreal and Martinez,* 5 Cir. 1977, 565 F.2d 932, the majority, in effect, overrules *United States v. Frisbie,* 5 Cir. 1977, 550 F.2d 335. I cannot see a meaningful distinction between the stop in this case and the stop in *Frisbie.* As I read *Frisbie,* the law in this circuit compels us to hold that the stop of the Almand vehicle was unlawful; the marijuana seized after the stop should not have been received in evidence.[1]

1. The majority notes that the same district judge who excluded the evidence in *Frisbie* admitted the evidence in this case. This does not mean that the trial judge saw a distinction between the two stops. In fact, the *Frisbie* Court reversed the trial judge's conclusion that

The majority concedes that the stop in this case is similar to the stop in *Frisbie.* Both stops took place in the vicinity of Big Bend National Park between six and seven in the morning; Frisbie was stopped on Highway 118 leading to Highway 90 and Almand was stopped on a nearby parallel road, Highway 385, also leading to Highway 90. Frisbie and Almand triggered some of the same sensor devices. The sensors first picked up both cars near the border on the western edge of Big Bend Park.

The factors considered by the *Frisbie* panel were similar to those the government relied upon in this case:

the direction the vehicle was traveling, the likelihood that the vehicle was coming from an unpatrolled river area, . . . the sparsely populated area where the stop occurred, [the Border Patrolman's] knowledge that local traffic did not normally travel the roads in question at such early hours of the morning and that the route in question was frequently traveled by persons transporting illegal aliens and contraband, with such activity taking place primarily in the late evening and early morning hours.[2]

550 F.2d at 337.

*Frisbie* also included an important factor that makes the facts in this case stronger for the defendant than the facts in *Frisbie.* Frisbie's truck appeared to be traveling in a convoy with two other vehicles. 550 F.2d at 336–37. This association of vehicles might have been interpreted as a "lead

car-load car" convoy. We have held that two cars in proximity on a sparsely traveled road "may understandably raise the officer's suspicions". *United States v. Barnard,* 5 Cir. 1977, 553 F.2d 389, 392.[3]

None of these circumstances impressed the *Frisbie* panel. Instead, the Court agreed unanimously that it could not approve a stop "founded upon dubious 'suspicious' circumstances of such slight import" particularly in an area visited by many tourists. 550 F.2d at 338. *See also United States v. Escamilla,* 5 Cir. 1977, 560 F.2d 1229, at 1232.

According to the majority, the Border Patrolmen possessed more legitimately acquired information than their colleagues in *Frisbie.* In particular, the majority notes (1) that Patrolman Wilson knew from the sensor signals that the vehicle he was investigating had stopped or turned off the highway; (2) that Wilson was aware, again from the sensor signals, that there had been no unexplained southbound traffic at the point where he found Almand's truck pointing south; and (3) that the Patrolmen knew the truck had been recently stopped because its grill was still warm.[4]

None of these circumstances is inherently suspicious or an indication of smuggling activity. In a national park area it is not unusual for tourists to drive campers, or to pull over to the side of the road for a nap. Indeed, a smuggler might be expected to continue his trip north rather than to stop by the roadside. The only consequence of the additional information listed by the ma-

the initial stop was legal. The *Frisbie* panel was able to affirm because the trial judge refused to admit the evidence for the different reason that questioning after the stop exceeded permissible bounds. The lower court's decision about the legality of the stop was the same in *Frisbie* as it was in this case. I would reach the same result as the *Frisbie* panel: the trial court erred.

2. The *Frisbie* Court also mentioned the government's argument that Frisbie had difficulty stopping his truck. The panel refused to consider this factor because the Patrolmen learned this fact *after* the stop began.

3. Such an observation does not, in itself, justify a stop. *United States v. Barnard,* 553 F.2d at 392. The *Frisbie* Court did not discuss the

potential significance of the three vehicle convoy in raising sufficient suspicion for a stop.

4. The majority also mentions, without comment, several facts that the government argues are pertinent. These facts are very similar to those found insufficient in *Frisbie.* Frisbie, unlike Almand, was driving his truck when the Border Patrol made its stop. Therefore, only Almand "refused to respond when first asked to open the door". A delay in responding to a knock at a camper door in the early morning when the occupant may be asleep can hardly be described as a suspicious circumstance. Moreover, it is clear that by the time the patrolmen were knocking on Almand's door they had already decided to make the stop.

jority is to make clearer that Almand's truck was the vehicle that had passed over the sensors.

This knowledge does not distinguish *Frisbie*. There was no doubt that Frisbie's car was the one that had tripped the sensors. *See generally* 550 F.2d at 336–38. Uncertainty whether Frisbie's vehicle had triggered the sensors was not a factor in the Court's decision that there was no reasonable suspicion that he was doing something illegal.

The majority points out that Almand's answers to the Border Patrol's questions were inconsistent with the other information gathered by the officers. Although this factor is included in the section of the opinion discussing the legality of the original stop, it relates only to justifying the expanded questioning that took place *after* the stop. The majority holds that the stop began when Almand stepped out of the rear of his camper. The questioning occurred after this event. "An observation made after and caused by a stop cannot be bootstrapped into grounds for reasonable suspicion warranting the stop." *United States v. Frisbie,* 550 F.2d at 338.

Because I believe the original stop was illegal, I would exclude the evidence discovered during the search of the truck. Even if one assumes that Almand consented to the search, and that the patrolmen acted reasonably, the consent and the evidence are fruits of the poisonous tree, and should be suppressed.

It is easy to find that one border search differs slightly from another. But *Frisbie* and *Almand* are as alike as peas in a pod. If the majority of the members of the full court think that *Frisbie* was wrongly decided, the court en banc can correct the error. Until that happens, I cannot accept bypassing *Frisbie* by resorting to inconsequential factual differences intended to distinguish the facts in *Frisbie* from the facts in the case before us.