**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Forest Robert CARROLL,**
**Defendant-Appellant.**

**No. 78–5213.**

United States Court of Appeals,
Fifth Circuit.

March 23, 1979.

Lawrence L. Barber, Jr., Monahans, Tex. (Court-appointed), for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., Richard P. Mesa, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before GEWIN, HILL and FAY, Circuit Judges.

JAMES C. HILL, Circuit Judge:

The issue this appeal presents is whether the stop of Appellant by the Border Patrol Agents was based on a reasonable suspicion. Since we agree with the District Court's conclusion that there was a reasonable suspicion for the stop, we affirm.

The critical facts necessary to determine the search and seizure issue were established at the suppression hearing. The suppression hearing consisted of the testimony of Border Patrol Agents Brenner and Newberry, who had twelve and eight years experience, respectively. Their testimony revealed that they stopped a pickup truck, driven by Oscar Rodriguez, around 9:00 a. m. on January 2, 1978, at a temporary checkpoint located 14 miles south of Alpine, Texas on Highway 118. The temporary checkpoint was approximately 65 air miles from the border and 45–50 miles from the western entrance to Big Bend National Park. Rodriguez was known by the Agents to be a narcotics smuggler. In fact, Agent Newberry had personally arrested Rodriguez' brother and two other family members on smuggling charges. Rodriguez was travelling with his grandmother, an undocumented alien, whom he was taking to Portales, New Mexico. Traces of marijuana residue in the bed of the pickup Rodriguez was driving were plainly visible to the Agents as well as a cut spare tire which also contained marijuana residue. Rodriguez was placed under arrest, and Agent Brenner questioned him. Rodriguez told Agent Brenner that he had brought a man across the river at San Elena the previous night, however, he did not describe the man at all. He claimed that this man must have the marijuana which left the residue in the pickup. Rodriguez persisted in claiming that he did not know the man to whom he had given a ride. Rodriguez's pickup had a C.B. radio in it, leading the Agents to believe that it was the scout or lead vehicle in a lead vehicle/load vehicle smuggling operation. Because of the hilly terrain, the Agents knew that the effective C.B. range was only 1 or 2 miles. Therefore, they

suspected that the load vehicle was nearby. The Agents then called their radio operator in Marfa and requested that a DEA agent be sent to the temporary checkpoint. Because of radio difficulties, there was a substantial delay before the arrival of the DEA agent at the temporary checkpoint.

While Agent Brenner continued questioning Rodriguez and while they were waiting for the DEA agent, another pickup arrived at the temporary checkpoint containing two tourists who had just left Big Bend National Park. Agent Newberry asked them if they had seen any vehicles south of the temporary checkpoint. They said that they had seen only one vehicle, a camper, pulled off towards the back of a rest area near a fence 1½ miles south of the checkpoint. After waiting 45 minutes for the arrival of the DEA agent, the Agents immobilized Rodriguez by taking his keys and proceeded south toward the rest area. The rest area was really nothing more than a dirt pull-off with 6 to 8 trees, used primarily as a beer party site by students from a nearby college. Tourists normally used a regular roadside park, maintained by the Texas Highway Department, located approximately 15 miles south of the temporary checkpoint. As the Border Agents drove into the pull-off area they saw Appellant's camper pickup parked in the far, back portion of the rest area, near the fence line; it was located slightly behind a low hill and well off the road. As they left the vehicle and approached the rear end of the pickup camper, they observed that Appellant's truck had a C.B. radio, that the camper had come from a dirty area "common in the river area," and that there were footprints on the ground indicating that someone had been walking near the rear of the pickup. The Agents parked behind the vehicle, with Agent Brenner approaching the front and Agent Newberry walking toward the rear. On his way toward the front of the pickup, Agent Brenner peered in the windows but saw no persons within. Agent Brenner observed Appellant lying on the front seat and he tapped on the window for Appellant to get out. The Agents identified themselves as Border Patrol Agents and asked him for some identification. Appellant produced a New Mexico drivers license and indicated that he had been coming from the park. He stated that he had been there about an hour, and that he had been sick from drinking too much beer. There were indications on the ground nearby that Appellant had been sick; however, although visibly nervous, he did not appear to be intoxicated; he was alert and had no problems communicating with the Agents. Agent Brenner then stated that they wished to look in the back of the camper, if Appellant did not mind, to which Appellant replied "O.K.," but stated that the only thing they would find would be dirty clothes. Appellant then assisted the Agents in opening the upper door of the camper. Inside, to the rear was a built-in box with a mattress on top which covered the full width of the pickup and was approximately 2½ feet high and 3 feet wide. The first thing that the Agents noticed was that there were very few personal effects in the back of the truck which was unusual since most tourists had fishing gear, personal gear, clothes and even small boats in their campers. As Agent Brenner leaned into the pickup he smelled the odor of marijuana. He asked Appellant if the mattress box was hollow and how he could open it. Appellant then informed Brenner that he had only to lift the mattress, which he did and discovered the marijuana. A search of the box revealed four bags of marijuana weighing approximately 105 pounds, and Appellant was placed under arrest.

Appellant submits that under the facts and circumstances of this case the Border Patrol Agents did not have a sufficient basis—a reasonable suspicion—for making the initial stop. He depends upon two cases decided by this Court in the last two years: *United States v. George,* 567 F.2d 643 (5th Cir. 1978); *United States v. Frisbie,* 550 F.2d 335 (5th Cir. 1977). In response, the Government argues that the "reasonable suspicion" test set forth in *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), sustains the stop in this case.

The focus in this case is on the stop by the roving patrol. The Agents' tapping on the window and their questioning of Appellant constituted a stop within the meaning of the Fourth Amendment. *See, e. g., United States v. Almand,* 565 F.2d 927, 929 (5th Cir. 1978); *United States v. Robinson,* 535 F.2d 881, 883 n. 2 (5th Cir. 1976). Appellant takes issue only with the stop. If the stop was permissible, then all that followed was justified. The Fourth Amendment permits warrantless investigatory stops if based on a reasonable suspicion, stemming from specific articulable facts, that the particular individual is involved with criminal activity. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 880, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Wright,* 588 F.2d 189 (5th Cir. 1979); *United States v. Hall,* 557 F.2d 1114, 1117 (5th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 308, 54 L.Ed.2d 194 (1977).

We agree with the District Court's conclusion that the facts known to the Agents assessed against their experience justified an investigatory stop because they could reasonably suspect Appellant was engaged in marijuana smuggling. *See, e. g., United States v. Shipp,* 566 F.2d 528, 529 (5th Cir. 1978); *United States v. Clark,* 559 F.2d 420, 423–24 (5th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977); *United States v. Worthington,* 544 F.2d 1275, 1279–80 (5th Cir.), *cert. denied,* 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977); *United States v. Robinson,* 535 F.2d 881, 883 (5th Cir. 1976). At the time that the stop was made, the Agents, who had a combined total of 20 years border experience, 10 years of which was in this exact area, knew the following: they had stopped Rodriguez, a known narcotic trafficker who had crossed the border that night with an unknown person and had marijuana debris in the bed of his pickup truck; the person Rodriguez had ferried across the river allegedly owned and still possessed the marijuana which had left the debris; a second pickup camper was parked 1½ miles south of the temporary checkpoint and was the only vehicle that had been seen by the tourists travelling from the Big Bend National Park who themselves reached the checkpoint shortly after Rodriguez' truck; both Rodriguez' and Appellant's trucks were equipped with C.B. radios, and the Agents were aware of the use of this equipment by smugglers engaged in lead car/load car tandem smuggling operations; alien and narcotics smugglers had used the lead car/load car *modus operandi* in most of the smuggling cases the Agents had encountered; Appellant's car was dirty, as though it had been in the river area; there were several sets of footprints around the rear of Appellant's camper indicating someone had been in or out of the camper; Appellant's camper was located at the end of the C.B. radio range in that area; tourists did not normally use that pull-off area for picknicking or rest stops; and Appellant's vehicle was secluded in the rear of the pull-off area and not on the common path.

These factors at least equal, and in fact surpass, those which this Court found sufficient to justify a stop on this same road, *United States. v. Saenz,* 578 F.2d 643 (5th Cir. 1978); *United States v. Villarreal,* 565 F.2d 932 (5th Cir. 1978), and on a companion road, *United States v. Almand,* 565 F.2d 927 (5th Cir. 1978). In *Saenz,* the sensory pattern of the traffic indicating the vehicles traveling from Study Butte, Texas, were traveling in tandem style and the officers' recognition of it as a smuggling method, the dust and mud on the vehicle and the defendant's erratic driving pattern were found to constitute reasonable suspicion. 578 F.2d 643. In *Villarreal,* this Court found that the lead car/load car *modus operandi* indicated by the sensory pattern of traffic, the presence of C.B. equipment, the location of the second vehicle within C.B. range, and the signs that the second vehicle had turned around and stationed itself facing south on the same highway as is in question here were sufficient to justify the officers' approaching the vehicle and questioning the occupant. 565 F.2d at 934–35. These factors were present here in

**1136**

addition to definite knowledge that a marijuana load, which had been imported into the vicinity from Mexico, was in the hands of an unknown person, and Appellant's camper, the only other vehicle in the area, was stopped within C.B. range just short of the temporary checkpoint.

In arguing to the contrary, Appellant seeks to rely on *United States v. Frisbie,* 550 F.2d 335 (5th Cir. 1977), and *United States v. George,* 567 F.2d 643 (5th Cir. 1978). However, what distinguishes these cases is the presence here of specific, known details garnered from the Agents' observations and from questioning Rodriguez, in addition to those factors known in *Frisbie* and *George*—geographical and intelligence data, the area sensory patterns of traffic, and in the latter, the physical appearance of the vehicle. Each of these cases must turn on its particular facts, *United States v. Barnard,* 553 F.2d 389, 391 (5th Cir. 1977), and those facts known to the Agents here sustain this "stop." *See also United States v. Hosch,* 577 F.2d 963 (5th Cir. 1978); *United States v. Escamilla,* 560 F.2d 1229 (5th Cir. 1977).

AFFIRMED.