**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**Nathaniel STRICKLAND, a/k/a Butch,**
**Defendant-Appellant.**

**No. 73–3211.**

United States Court of Appeals,
Fifth Circuit.

April 26, 1974.

Ben C. Abney (Court-appointed), William Pitts Carr, Atlanta, Ga., for defendant-appellant.

John W. Stokes, Jr., U. S. Atty., J. Robert Cooper, Steven Ludwick, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before DYER, MORGAN and RONEY, Circuit Judges.

DYER, Circuit Judge:

The principal thrust of Strickland's appeal is that a New York Police Department detective, redolent of good intentions and with an avuncular manner, deceived Strickland into believing that incriminating statements which he made during a police investigation into a shooting attack on him while attempting to purchase heroin, were to be used solely for the state prosecution of Strickland's attackers and had no Januslike implication that would lead to his indictment, prosecution and conviction for conspiring to unlawfully distribute heroin hydrochloride in violation of 21 U.S. C.A. §§ 841 and 846.[1] We affirm.

In early August, 1972, Strickland, while vacationing with his girl friend and her son at the Playboy Club in Ochos Rios, Jamaica, fortuitously met Peter Vario, his wife and daughter, who were also guests at the Club. They became friendly, and Vario, who lived in New York, indicated that he could acquire narcotics in that city for Strickland, who lived in Atlanta, Georgia.

After Strickland returned to Atlanta, he telephoned Vario in New York, and on August 23, 1972, Strickland drove from Atlanta to North Carolina, flew from there to Newark, New Jersey, and then checked into the City Squire Motor Inn in New York City. After his arrival Strickland telephoned Vario and met with him that night. The two discussed their business, and before leaving Vario informed Strickland that someone would call later.

The following day, August 24, 1972, Strickland moved to the Americana Hotel, where he received a call from Vario, who indicated that someone else would call him later. At Vario's request, "Mike" called on Strickland that night to "discuss business." At this meeting Strickland agreed to purchase two kilos of heroin for $48,000 cash and $12,000 credit. He then telephoned a contact in

Atlanta and arranged for the person to obtain $48,230 in cash from Strickland's attic and to bring it to New York. The directive was carried out, and Strickland received the money on August 26, 1972. He then met with Mike and paid him $48,000 in cash. Later in the day Mike introduced him to "Lennie," who drove Strickland to a junk yard to pick up the heroin. At Lennie's request Strickland got out of the car to open a gate, at which point Lennie shot him. Strickland managed to escape and run to a gasoline station where he was later picked up by an ambulance and taken to the intensive care unit of a hospital.

On August 27, 1972, Detective Gorman of the New York Police Department, Homicide Assault Squad, visited Strickland in the hospital, identified himself and informed Strickland that he was investigating the assault. During the interview, Strickland related the details of his misfortune. Gorman assured Strickland at some point in the interview that the police were only interested in investigating the assault. In fact, to prevent further possible assaults on Strickland, a plainclothes officer was posted outside his hospital room. Despite Gorman's assurances, Strickland was subsequently prosecuted in the Northern District of Georgia for narcotics violations, following his appearance before a federal grand jury in New York engaged in an investigative probe.

During the hearing on Strickland's motion to suppress the incriminating statements made by him to Gorman on August 27, 1972, the detective was at first somewhat equivocal about *when* he told Strickland that he was not going to do anything about possible narcotics violations—that his sole interest was to arrest and prosecute the individuals who had shot Strickland. Finally, when interrogated by the court Gorman maintained that he told Strickland that the only way he could help him recover his money and prosecute those responsible

1. Strickland also argues that there was improper venue, insufficiency of evidence to corroborate admissions, evidentiary error, and that evidence should have been suppressed as the fruit of illegally obtained confessions.

for the assault was for Strickland to relate to Gorman the details surrounding the attack. Gorman further testified that in response to this request Strickland told him the whole story, and that it was not until Gorman was about to leave that he informed Strickland that he was interested not in the narcotics aspect of the case but in carrying out his duties as a member of the city's assault squad. The district court ruled that any statements made by Strickland after Gorman disavowed any interest in a narcotics prosecution would be suppressed.

At trial, without objection, the detective related in detail what Strickland had told him at the August 27, 1972, interview. On cross-examination, in response to a question whether he had told Strickland that he was not interested in prosecuting him, the detective answered:

> After talking, just at the end of the interview, I believe Mr. Strickland also stated to me can I get in trouble for this? My statement to him at that particular time was my interest is not in you, my interest is in the people who shot you, you are a victim of a crime, that is my primary concern here. That was the statement I made to him prior to leaving the hospital on the 27th.

The Government, without objection, then introduced into evidence a transcript of Strickland's testimony before a federal grand jury in New York. It is undisputed that he was fully and properly advised of his constitutional rights before testifying in that proceeding and that he voluntarily waived his rights. He related in detail to the grand jury the events that took place from his initial meeting with Vario in Jamaica until he was relieved of his $48,000 and shot in New York.

At the close of the Government's case, Strickland moved for a judgment of acquittal because of improper venue, and he also moved to exclude Gorman's testimony because it varied from that given during the suppression hearing. The motions were denied, the jury found Strickland guilty, and this appeal ensued.

■ Strickland launches a many-pronged attack on the admissibility of his incriminating statements made in the hospital interview with Gorman. Only two of his contentions merit discussion.[2] First, Strickland points to Gorman's equivocation at the pretrial hearing concerning the precise time during the interview of August 27 when the detective told Strickland that he had no interest in pursuing a narcotics case. Claiming that this representation was made at the beginning, not at the end of the interview, Strickland says that he was induced by a promise or hope of immunity from prosecution which rendered his admissions involuntary and inadmissible.

■ This contention cannot stand. At the hearing on the motion to suppress the court ruled out any admissions made *after* the detective assured Strickland that his only interest was in the assault aspect of the case. At trial Gorman, without objection, testified fully concerning Strickland's admissions on the basis that they were made before Gorman gave Strickland any assurances.

What we said in Andrews v. United States, 5 Cir. 1962, 309 F.2d 127, 129, is apropos here:

> Appellant insists that the written confession and other admissions introduced in evidence were not voluntary and thus not admissible. Whether or not such extra-judicial statements are

---

2. We find without support in the record and therefore without merit Strickland's argument that on August 27, 1972, he was the focus of a narcotics investigation. On the contrary, he was not in custody and was not suspected of committing any crime. Attention was focused on Strickland because he was the victim of a crime and not a suspect. In these circumstances, no *Miranda* warning was necessary, nor were his rights to counsel under *Escobedo* impaired.

voluntary is a preliminary question of fact to be determined by the trial judge. The judge found that the admissions and confessions were voluntary, and a careful review of the record leads us to the conclusion that the trial court committed no error in allowing the introduction of the evidence.

■ After the Government rested, Strickland moved to exclude the detective's testimony because it varied from his pretrial testimony. The district court properly denied the motion. If Gorman's testimony at the pretrial hearing contradicted in any particular that which he gave at trial, Strickland could have developed this variance by cross-examination and thus could have attempted to impeach Gorman. At the end of the case the court had no power to exclude the testimony of a witness on the ground that it was claimed to be, in some respects, inconsistent with testimony previously given by the witness. It was for the jury to determine whether the witness spoke the truth. As was stated in *Andrews, supra* at 129: "Of course, the weight and credibility ultimately to be given the statements were questions for the jury, who obviously believed them."

■ Next, it is urged that Strickland's admissions were not voluntary because they were made while he was in the intensive care unit and while he was either lapsing in and out of consciousness or intermittently sleeping. Although Strickland argues that the court made no independent determination of voluntariness as required by Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, it is manifest that this issue was resolved against Strickland at the pretrial suppression hearing. *See* Sims v. Georgia, 1967, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593. Since Strickland did not testify at trial the court properly submitted this issue to the jury with a proper charge that the admissions had to be freely, voluntarily and

intentionally made in order to be considered.

■ Strickland next asserts that his New York grand jury testimony should have been suppressed as being the "fruit of the poisonous tree." Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. Strickland's argument is premised upon the inadmissibility of his initial incriminating statements, which led to his appearance and testimony before the grand jury. He urges that we adopt a but-for rule to give effect to his Fifth and Sixth Amendment rights, i. e., evidence should be excluded which would not have been discovered but for the improperly obtained statements.

This contention gives us little pause. Strickland's premise is undercut because, in the circumstances which have been related, his initial incriminating statements made on August 27, 1972, were found to be admissible. Moreover, it is undisputed that he was fully advised of his constitutional rights before testifying before the grand jury on September 14, 1972. Assuming, *arguendo,* that Strickland's initial admissions were tainted, the connection between the admissions and the grand jury testimony had "become so attenuated as to dissipate the taint." Nardone v. United States, 1939, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307.

The but-for argument of Strickland was put to rest in Rogers v. United States, 5 Cir. 1964, 330 F.2d 535, where, in speaking of Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, we said:

In *Wong Sun,* were it not for the arrest, it is clear that no statement would have been made. But the Court found it improper to "hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." 371 U.S. at 487–488, 83 S.Ct. at 417, 9 L.Ed.2d 441. The Court seemed to indicate the necessity

for the intervention of a clear act of free will on the part of the defendant in order to purge the evidence of its stigma.

*Id.* at 541.

We find that there was sufficient evidence of free will to conclude that any arguable taint in the initial admissions made on August 27, 1972, could not have infected the grand jury testimony of September 14, 1972. *See* Samora v. United States, 5 Cir. 1969, 406 F.2d 1095; Thomas v. United States, 5 Cir. 1967, 377 F.2d 118, cert. denied, 389 U. S. 917, 88 S.Ct. 246, 19 L.Ed.2d 273.

■ Strickland's next contention, that there is insufficient evidence independent of his admissions to support the verdict, is without merit. In the seminal case of Opper v. United States, 1954, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L. Ed. 101, the Court stated "the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti.*" In this case there was more than sufficient "independent evidence which would tend to establish the trustworthiness of the statement," and it adequately supported "the essential facts admitted sufficiently to justify a jury inference of their truth." *Id.* at 93, at 164 of 75 S. Ct. See *Andrews, supra* at 129 of 309 F.2d. There was documentary evidence to establish Strickland's trip to Jamaica and his stay at the Playboy Club in Ochos Rios. His trip to New York and his stay at the two hotels were proven by the hotel's records; his calls to Vario are recorded on his hotel bills, and his statement that Vario is in the Mafia was confirmed. That he was shot, robbed and taken to the hospital was proven *aliunde* the admissions. All of this adds up to more than adequate corroboration. United States v. Frazier, 5 Cir. 1970, 434 F.2d 994. *Cf.* United States v. Khandjian, 5 Cir. 1974, 489 F. 2d 133.

■■ Finally, Strickland urges us to reverse his conviction because of improper venue in the Northern District of Georgia. He concedes, as he must, that venue in a conspiracy case may be laid in the district where the conspiracy was formed, as well as in any district where an overt act in furtherance of the conspiracy took place. Hyde v. United States, 1912, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114; Ladner v. United States, 5 Cir. 1948, 168 F.2d 771; Pullin v. United States, 5 Cir. 1939, 104 F.2d 57. The evidence *sub judice* was more than adequate to show that the conspiracy, while originally discussed in Jamaica, was carried out by overt acts in Atlanta. Strickland called Vario in New York from Atlanta on August 16, 1972, as had been agreed upon in Jamaica. Strickland telephoned a person in Atlanta from New York with instructions to obtain $48,230 from Strickland's attic and to bring it to New York. This money was to be used to purchase two kilos of heroin from Vario and his confederates, and it was this money which was taken from Strickland before he was shot. The telephone calls and conversations to and from Atlanta were overt acts. Singer v. United States, 6 Cir. 1953, 208 F.2d 477, 480; Bartoli v. United States, 4 Cir. 1951, 192 F.2d 130, 132; Smith v. United States, 9 Cir. 1937, 92 F.2d 460, 461. And these overt acts were "committed in pursuance of the agreement." United States v. Agueci, 2 Cir. 1962, 310 F.2d 817, 828, cert. denied, 1965, 372 U. S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12. Consequently, we find no merit in Strickland's contention that venue laid in the Northern District of Georgia was improper.

The judgment of the district court is

Affirmed.