UNITED STATES of America, Plaintiff-Appellee,

v.

Jesus Ybarra VILLARREAL and Abundio Hernandez Martinez, Defendants-Appellants.

No. 77–5079.

United States Court of Appeals, Fifth Circuit.

Jan. 9, 1978.

Rehearing and Rehearing En Banc Denied March 13, 1978.

Richard C. Abalos, Gerald R. Lopez, Odessa, Tex., for defendants-appellants.

Jamie C. Boyd, U.S. Atty., LeRoy M. Jahn, Asst. U.S. Atty., Ronald P. Guyer,

Trial Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

GEWIN, Circuit Judge:

Appellants Jesus Ybarra Villarreal and Abundio Martinez were tried before the court and found guilty of conspiracy to possess marijuana and heroin with the intent to distribute.[1] On appeal Villarreal and Martinez argue that the trial court erred in refusing to suppress evidence obtained as the result of a warrantless search. Appellants also challenge the sufficiency of the evidence to sustain their convictions. We affirm.

On the morning of February 5, 1976, just before 7:00 a.m. sensor devices along the Texas-Mexico border at Marfa indicated that two vehicles, coming from an unpatrolled border area, were traveling together north on state highway 118 towards Alpine, Texas. This information was radioed to Border Patrol Agent Wilson[2] at Alpine, who ordered Patrol Officers Newberry and Whittington to intercept the vehicles. Agent Wilson followed the two officers south on highway 118 and stationed himself a short distance south of their checkpoint on a ranch road running parallel to that highway.

About 7:15 a. m. a pickup truck equipped with CB radio antennas approached the border patrol checkpoint. The agents saw the passenger duck below the dashboard for a moment and noticed that both the driver and passenger appeared to be of Mexican ancestry. The truck stopped at the checkpoint and the occupants were questioned concerning their citizenship. At this time Officer Newberry noticed an operational CB radio on the floor of the vehicle and a microphone on the seat.

Agent Wilson arrived at the checkpoint and directed the officers to travel south and locate the other vehicle indicated by the sensors. Agent Wilson remained behind to question the occupants of the truck. While questioning the men Wilson noticed a pistol case on the seat. A subsequent search of the vehicle revealed a .22 caliber pistol in the glove compartment. Wilson radioed this information to the other officers.

---

1. Co-defendant Daniel Torres was also indicted on the same counts and in addition on four counts of importation and possession of marijuana and heroin with the intent to distribute. Torres was found guilty on the conspiracy counts and for possession of heroin and marijuana with intent to distribute. Torres' motion for judgment of acquittal was granted on the importation counts. He was sentenced under the Federal Youth Corrections Act and did not appeal his conviction.

2. In his Findings of Fact pursuant to his order denying defendants' motion to suppress, Judge Suttle found that after the radio transmission Agent Wilson was aware that:

  (a) A sequential tripping of sensor devices on Ranch Road 170 and Highway 118 had occurred;

  (b) The lapse of time between the tripping of different sensors indicated a rate of speed that could reasonably be attributed only to vehicular traffic.

  (c) The order of signals indicated that:

  1. Two vehicles were traveling east on Ranch Road 170 within seconds of each other;

  2. Both vehicles began traveling north on State Highway 118 within seconds of each other;

  3. Approximately one hour later two vehicles were traveling north on State Highway 118 approximately two minutes apart.

  (d) There were numerous uncontrolled ports of entry connecting to Highway 118 and to Ranch Road 170. Presido was the only manned port of entry directly connected to those roads.

  (e) The geography of the area created a substantial possibility that the vehicles tripping the sensors had come from an unpatrolled river area.

  (f) The area along the border was sparsely populated.

  (g) Local traffic did not normally move along Ranch Road 170 and State Highway 118 in those early morning hours.

  (h) Aliens and contraband substances were frequently transported toward Alpine on State Highway 118 primarily during the late evening and early morning hours.

About 3 miles south of the checkpoint, Officers Whittington and Newberry, who had received Wilson's message enroute, discovered a Chevrolet Nova with a CB antenna parked at a rest stop. The car was parked as if heading south, but tracks in the road indicated that it had made a U-turn in that direction. The driver's door was open, and Agent Newberry saw the occupant, Torres, bend down as if he was placing something under the car. The officers parked their vehicle behind the Chevrolet. Agent Newberry got out and walked towards the car while Whittington provided cover.

Newberry asked the driver to step out of the vehicle. Torres got out and the agent patted him down and questioned him concerning his residency and citizenship. Newberry then looked inside the car and smelled what he recognized to be marijuana. He asked Torres to open the trunk; Torres removed the keys from the ignition and complied with the officer's request. In the trunk were approximately 105 pounds of marijuana. Further search revealed a container of heroin beneath the car.

The agents arrested Torres for possession of marijuana and heroin and radioed this information to Agent Wilson. Wilson then placed Villarreal and Martinez under arrest. It was later established at trial that the Nova had been loaned to Martinez by Danny Johnson, a fellow employee.

The Border Patrol also obtained evidence that Villarreal and Martinez had been at the Rio Grande River on the Texas-Mexico border on the morning of their arrest. On the river bank an agent well experienced in tracking found vehicle tracks, footprints, and horsetracks. Two sets of footprints led from the vehicle to the river's edge. A set of horsetracks came from the water to the area where the footprints stopped. There was evidence that there was an imprint in the wet dirt indicating that an object had been placed there. An additional set of footprints indicated that someone had dismounted from the horse. The tracks then led from the river's edge to the vehicle.

The horsetracks led back to the river. The agent determined that two sets of footprints had been made by Villarreal and Martinez and that the tire tracks had been made by the Chevrolet Nova, all on the morning of February 5, 1976.

## I.  The Legality of the Stop

This case must be decided in light of two recent decisions by this court involving similar facts. *United States v. Frisbie*, 550 F.2d 335 (1977) and *United States v. Barnard*, 553 F.2d 389 (1977). In *Frisbie*[3] the stop was made on the same highway and at approximately the same hour in the morning as the stop of Villarreal and Martinez. The officers were informed that sensor devices indicated that three vehicles were traveling north on highway 118. They stopped the first two vehicles to determine the citizenship of their occupants and allowed them to proceed. When the third vehicle approached an officer signalled it to stop. As it attempted to slowdown, the officer noticed that it was riding low and that the driver was having difficulty in stopping, leading the officer to believe that it was heavily loaded. The vehicle was subsequently found to contain marijuana. The court held that observation of the vehicle or its occupants made after the officer had signalled it to stop could be assigned no weight in a determination of the legality of the stop. Thus, the information gained by the sensor devices, even in conjunction with such factors as the characteristics of the area and the time of day, was held to be insufficient to give rise to reasonable suspicion that the vehicles were carrying illegal aliens. The court in particular noted that highway 118 was located near the westernly entrance to Big Bend National Park, an area visited by thousands of tourists a year, and that the sanctioning of stops on the basis of the slight evidence presented in *Frisbie* would subject innocent people to unreasonable detention merely because they happened to be on the road at a suspect hour.

3.  The trial judge in *Frisbie* also tried the instant case.

In *Barnard* no sensor devices were involved. There a border patrolman was passed one morning by two cars traveling about a mile apart. The first to pass him was an MG with a citizen's band (CB) radio antenna. The driver appeared to be speaking into a microphone as the vehicle passed. The MG was followed by a Mercury with a CB antenna. Each vehicle had the same three-letter prefix, FBU, on its license plates, indicating that they were registered in the same county, a county other than the one through which they were traveling. The driver of the Mercury appeared to be nervous and the rear of the vehicle appeared to be riding low. These facts aroused the officer's suspicions that the Mercury might be transporting illegal aliens in its trunk. He followed the Mercury which varied its speed from 35 to 60 miles per hour. The road was sufficiently straight for the officer to see that the MG in the lead altered its speed to maintain a constant distance between itself and the Mercury. The officer, after following the vehicles for 10 or 15 miles, stopped the Mercury. While questioning the driver at the rear of the car the officer smelled marijuana. When the trunk was opened it was found to contain 84 pounds of the substance.

In holding that the stop was legal the court stated that the reasonable suspicion equation of *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), was satisfied by the fact that the vehicle appeared to be heavily loaded, that its driver glanced nervously at the officer, drove erratically while being followed, was from another county, and was heading away from the border in an area generally devoid of significant tourist or business activity. The Court noted, however, that its decision to uphold the stop was facilitated by an additional factor—the "lead car-load car" smuggling technique, where one car operates as the scout car for the vehicle following with the contraband. This modus operandi was indicated in *Barnard* by the fact that two vehicles with CB antennas and non-resident license plates, both apparently from the same county, were traveling north in close proximity on a lonely road 20 miles from the border.

The instant case contains an amalgam of factors present in either or both *Frisbie* and *Barnard*. *Frisbie's* significance to appellants' case lies in the fact that both stops were made on the same highway, a highway with substantial tourist traffic. Aside from this fact the cases have little similarity. The stop in *Frisbie* was made largely upon the basis that sensors at an early morning hour indicated that three cars were traveling north from the border. On this evidence alone the officers indiscriminately stopped each vehicle until they obtained results.

In the appellants' case, not only did sensors indicate two vehicles traveling north from the border in close proximity for approximately an hour, but the officers, before stopping the lead vehicle, observed that it had CB antennas, that its occupants appeared to be of Mexican descent, and that the passenger ducked beneath the dash as the vehicle approached the Border Patrol car. From this information, we conclude that the officers could have reasonably inferred that the vehicle initially stopped was the scout car for a second vehicle, indicated by the sensors, engaged in the transportation of illegal aliens.[4] *United States v. Barnard*, 553 F.2d at 392. The stop of this vehicle to determine whether it was in-

---

4. In *Brignoni-Ponce* the Court stated that in deciding whether reasonable suspicion exists to stop a vehicle in a border area, "the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Id.* at 885, 95 S.Ct. at 2582, 45 L.Ed.2d at 619. Testimony in the instant case established that the officers involved in the instant case possessed considerable experience in this area. Officer Wilson had been a Border Patrolman on the United States-Mexico border since 1954. Officer Newberry testified that he had been stationed as a Border Patrolman at Alpine, Texas, for approximately six years. Officer Whittington testified that he had been a Border Patrolman for five and a half years. Officer Murphy, the agent who investigated the tracks on the riverbank stated that he had been with the Border Patrol for 16 years.

volved in the transportation of illegal aliens was therefore proper under the circumstances. Although the fact that the stop was made on a highway frequented by tourists is one factor for the court to consider in determining whether such a stop was legal, it is not controlling. Just as proximity to an international border does not provide law enforcement officers with carte blanche to stop and question travelers at will, *United States v. Brignoni-Ponce,* 422 U.S. 873, 882–83, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607, 617 (1975), so highways favored by tourists are not thereby transformed into safe conduits for traffickers in contraband. Reasonable suspicion for the stop must be determined in light of the particular facts and circumstances of each case.

■ The detention of the second vehicle was also proper.[5] The officers knew that two vehicles had been traveling together for more than an hour, that the second vehicle had not reached their position, and that the first vehicle contained a CB radio which could have been used to warn the trailing vehicle of the officers' presence. Agents Newberry and Whittington then proceeded south for approximately three miles where they came upon a Chevrolet Nova with a CB antenna parked at a rest stop. The car was facing south and tracks in the highway indicated that the vehicle had made a U-turn from north to south. The driver's door was open and as the agents drove towards the vehicle, Agent Newberry noticed that the driver bent over and placed something under the car. On the basis of these factors the officers had reasonable suspicion to stop the second vehicle.

## II. The Search

■ The odor of marijuana detected by Agent Newberry as emanating from the car furnished him with probable cause to search the trunk. *United States v. Barnard,* 553

F.2d 389 (5th Cir. 1977); *United States v. Andrade,* 545 F.2d 1032 (5th Cir. 1977); *United States v. McCrary,* 543 F.2d 554, 555 (5th Cir. 1976); *United States v. Diaz,* 541 F.2d 1165, 1166 (5th Cir. 1976). Probable cause for the search under the vehicle which revealed the heroin was supplied both by the discovery of the marijuana and Torres' movements beneath the car at the approach of the officers. The discovery of the contraband provided probable cause for the subsequent arrest of Villarreal and Martinez.

■ Appellants raise the issue of whether Torres consented to the opening of the trunk. The trial judge found that Torres' consent was "freely and voluntarily given." Looking at the circumstances of this case we cannot say that Torres' consent to open the trunk was not voluntarily given. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Torres made no objection to opening the trunk nor is there any evidence that the officers coerced him into doing so.

## III. Sufficiency of the Evidence

■ Appellants contend that the amount of heroin discovered beneath the car driven by Torres was insufficient to support their convictions of conspiracy to distribute heroin. The street value of the 75.5 grams of 49% heroin seized was substantial.[6] There was evidence that the heroin would be sufficient to supply three addicts for three months. Considering this evidence in a light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 80 L.Ed. 680 (1942), we find that the evidence is sufficient to support the convictions for conspiracy to distribute heroin.

■ Appellant Villarreal also argues that there was insufficient evidence to sustain his conviction for conspiracy to possess

---

**5.** Under the Fourth Amendment a stop " . . . does not mean a physical stop but rather a restraint of movement." *United States v. Robinson,* 535 F.2d 881, 883 n.2 (5th Cir. 1976).

**6.** One drug agent testified that the heroin had a street value of $25,200.00.

with intent to distribute marijuana. A conspiracy may be found "[i]f the totality of the evidence is sufficient to show a concert of action, all parties working together understandingly, with a single design for the accomplishment of a common purpose . . . ." *United States v. Prout*, 526 F.2d 380, 385 (5th Cir. 1976), *quoted in Barnard, supra* at 393.

The *Glasser* standard must be applied in examining the sufficiency of the evidence. As discussed above there is substantial evidence connecting Villarreal as an active and knowing participant in a plan to possess and distribute marijuana.

Sensors indicated that the pickup truck which Villarreal was driving and the Chevrolet Nova in which the contraband was being transported had travelled together from the border for over an hour. Both vehicles were equipped with citizen band radios. When the pickup approached the checkpoint the passenger ducked beneath the dashboard in a manner which suggested that he was making furtive communications with the trailing vehicle. Villarreal's connection with the Nova was also supported by evidence which showed that the pickup truck's passenger, Mr. Martinez, had borrowed the Nova from one Danny Johnson.

A more direct connection between Villarreal and the conspiracy was established by evidence demonstrating the presence of Villarreal's footprints along with those of Martinez and the tire tracks of the vehicle at the riverbank where the delivery of the marijuana was shown to have taken place. The evidence further tended to show that Villarreal and Martinez received the contraband, loaded the Nova, left the delivery site and afterwards transferred to the pickup truck leaving Torres to drive the Nova. Thus, Villarreal, in aiding in the receipt of the marijuana and facilitating its transportation, acted in a manner which unmistakably forwarded the purpose of the conspiracy. *United States v. Alvarez*, 548 F.2d 542, 544 (5th Cir. 1977).

Villarreal's knowing participation in the conspiracy is shown by several factors, foremost of which is the manner in which his actions conformed to the lead car-load car modus operandi, delineated in *Barnard*. *See Barnard, supra*, at 393. In *Barnard* guilty knowledge was also found by the fact that three men were traveling in two vehicles when one would have sufficed. Finally, Villarreal's knowledge of the conspiracy was established by evidence which indicated that Villarreal switched from the vehicle in which the contraband was being transported to the scout vehicle. The evidence therefore supports the trial court's conclusion that Villarreal was guilty of conspiring to possess marijuana with intent to distribute.

AFFIRMED.

WISDOM, Circuit Judge, dissenting:

I respectfully dissent. In this case, as in *United States v. Almand*, 5 Cir. 1977, 565 F.2d 927, the majority, in effect, overrules *United States v. Frisbie*, 5 Cir. 1977, 550 F.2d 335. I cannot see a meaningful distinction between the stop in this case and the stop in *Frisbie*. As I read *Frisbie*, the law in this circuit compels us to hold that stopping the vehicle in which Villarreal and Martinez were riding was unlawful. The later stop and search of the second vehicle were the illegal products of the first search; the evidence obtained was the fruit of the poisonous tree.

In *Frisbie*, in *Almand*, and in this case the sensors first picked up the vehicles on the western edge of Big Bend National Park near the border (four, six, and nine miles) between six and seven in the morning on Highway 118 leading north to Highway 90, a major interstate east-west highway.

The majority states the appropriate standard for judging the legality of a stop by roving Border Patrolmen: reasonable suspicion. But as the Court stated, "observation of the vehicle or its occupants made *after* the officer had signaled it to stop [can] be assigned no weight in a determination of the legality of the stop." This statement is in accord with *Frisbie*, 550 F.2d at 338. The majority, if I may say so, with deference, misapplies this standard. The majority justifies the stop in this language:

In the appellants' case, not only did sensors indicate two vehicles traveling north from the border in close proximity for approximately an hour, but the officers, before stopping the lead vehicle, observed that it had CB antennas, that its occupants appeared to be of Mexican descent, and that the passenger ducked beneath the dash as the vehicle approached the Border Patrol car. From this information, we conclude that the officers could have reasonably inferred that the vehicle initially stopped was the scout car for a second vehicle, indicated by the sensors, engaged in the transportation of illegal aliens.

The record, however, shows that the officers did not observe the CB antennas, the apparent Mexican descent of the occupants, or a passenger ducking beneath the dash *before* signaling the appellants' vehicle to stop.[1] The quotations from the record in this dissenting opinion and its footnotes support this statement. The record shows that Border Patrol officers Wilson, Newberry, and Whittington decided to stop the vehicles and established a checkpoint *before* they had seen the vehicles.[2] Officer Wilson took a four-wheel drive vehicle and stationed himself on a parallel ranch road to stop any aliens that might jump and run when the stop occurred. Another officer parked a patrol car perpendicular to Highway 118 so that the Border Patrol emblem on the side of the car was "readily visible to any approaching vehicles [and] so they can see the red light". Transcript at 127. They chose a spot, according to agent Newberry, "so they [the drivers of the approaching vehicles] can see us". In cross-examination Newberry testified:

1.  Since *United States v. Frisbie*, 5 Cir. 1977, 550 F.2d 335 had not yet been decided, the officers could have believed that their suspicions were sufficient to stop the vehicles when they knew only that there were two vehicles on the highway.

2.  Q [Mr. Childs] And so in this particular instance the only suspicion that you had insofar as anything out of the ordinary is concerned was that three sensors had been set off?

Q [Mr. Childs]: So they can see you and come to a stop?
A [Agent Newberry]: Yes, sir.

.    .    .    .    .

Q [You] got out of the car into the highway?
A Yes, sir.
Q Did you just sit there for any length of time before the pickup showed up?
A Just a very short time, maybe a minute. Just a very short time.
Q When you saw it coming I guess you moved out into the highway?
A Yes, sir. I was there, yes, sir.

.    .    .    .    .

Q .   .   . When this pickup truck approached from the south there on Highway 118 and you were standing—were you standing approximately in the center of the highway?
A Yes, sir.
Q Apparently they approached in such a manner that you didn't think you were going to get run over or you didn't run off or anything like that?
A No.
Q They came to a normal stop?
A Yes, sir they slowed down to a normal stop.

.    .    .    .    .

Q And I believe that you testified that you saw one of them bend over?
A Yes, sir.
Q You saw the passenger bend over?
A Yes, sir.
Q As he approached?
A Yes, sir.
Q How far away was he?
A I'd say thirty-five or thirty yards.

A [Agent Newberry] Yes, sir.
Q And they were on 118?
A Yes, sir.
Q On that basis the three of you set out deliberately to intercept these two vehicles?
A Yes, sir.
Q And did you?
A Yes, sir.
Transcript at 126.

Q  How fast were they going?
A  They were coming to a stop.
Q  They were coming to a stop, and just twenty-five, thirty yards from you he bent over?
A  Yes, sir.
Q  What did you think then?
A  I didn't think anything at that time until he had come up and stopped even with me.

Transcript at 129–32.

Agent Newberry's direct testimony is to the same effect:

A  [Agent Newberry] We pulled the car beside the highway, which we let the emblem show on the side. We have a red light on it, on that car, and we pulled it on the west side of the highway, and I approached the center of the highway.
Q  [Mr. Guyer] All right. Were you in uniform?
A  Yes, sir, I was.
Q  Was Mr. Whittington in uniform?
A  Yes, sir.
Q  And what, if anything, what information had you received prior to setting up the checkstop?
A  We had received word via radio that there were two cars coming north on Highway 118.

Transcript at 118.

Agent Whittington's testimony is also to the same effect:

Q  [Mr. Guyer] And did you in fact encounter a vehicle that day?
A  [Agent Whittington] Yes. The first vehicle that—we heard it coming, and Mr. Wilson said that he could hear it too and I had the binoculars and Mr. Newberry was standing outside the vehicle getting ready to stop the vehicle.

Transcript at 153.

The record shows, therefore, first, that there was a Border Patrol car parked so as to display its government emblem and its red light to the first approaching vehicle. Second, agent Newberry was standing

squarely in the center of the highway on which the appellants were traveling. Only after the first vehicle approached did an officer see the pickup's CB antenna, the Mexican appearance of its occupants, and the ducking action of a passenger.

Before signaling to stop, the officers knew only the facts the majority lists in footnote 2 of its opinion. The majority does not attempt to distinguish these facts from those held insufficient to provoke a reasonable suspicion in *United States v. Frisbie,* 5 Cir. 1977, 550 F.2d 335. As we noted, the stops in this case and in *Frisbie* occurred on the same road and at almost the same time of day. In *Frisbie,* too, the stopping officers knew of a series of vehicles traveling together. Only by including information gained *after* the signal to stop does the majority distinguish *Frisbie* from this case. I would not uphold the stop of the pickup truck in which Villarreal and Martinez were traveling, the first vehicle the officers stopped.

The factual question here—what constitutes reasonable suspicion to stop—is important. But it is much less important than the principle that an officer must justify his stop on the basis of what he knew *before* invoking his power. The stop must be "reasonable in light of the facts known to the officer at the time". *Adams v. Williams,* 1972, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612; *United States v. Brignoni-Ponce,* 1975, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607, 618. As I see it, the majority approved the stop apparently because it brought information that would have justified it. I see no difference between this conclusion and a rule that would find that probable cause existed before every search later yielding contraband. I would hold that the stop of the "lead" vehicle was invalid.

The stop of the second vehicle [3] must also fail as an incident of the fruit of the poisonous tree doctrine. Once the defendant

**3.** Both the appellants were in the lead car rather than in the car that contained the contraband. The stop of the first car, in which the appellants were riding, yielded no contraband. The government's case is based on drugs found in the second car.

shows that the government's initial action was illegal "the burden falls upon the prosecution to prove that the information so gained has not 'led,' directly or indirectly, to the discovery of any of the evidence which it introduces". *United States v. Coplon*, 2 Cir. 1950, 185 F.2d 629, 636 (Learned Hand, J.), *cert. denied* 1952, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688. *See Murphy v. Waterfront Commission of New York*, 1964, 378 U.S. 52, 79 n.18, 84 S.Ct. 1594, 1609, 12 L.Ed.2d 678 in which the Court said, "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." The majority uses information from the illegal stop of the lead vehicle to justify the stop of the load vehicle. It says the u-turn made by the trailing car is a suspicious factor. But the u-turn is suspicious, by the majority's hypothesis, only because it was caused by a radio communication from the lead vehicle—a communication provoked by the illegal stop.[4]

The fruit of the poisonous tree doctrine requires that we ask "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint". *Wong Sun v. United States*, 1963, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455. The evidence seized from the load vehicle must be suppressed unless (1) "the Government learned of the evidence 'from an independent source'", 371 U.S. at 487, 83 S.Ct. at 417, *quoting Silverthorne Lumber Co. v. United States*, 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319, 321; or (2) "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the

taint'". 371 U.S. at 487, 83 S.Ct. at 417, *quoting Nardone v. United States*, 1939, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307.

The "independent source" exception has no role in this case. It applies only when the independent source of information provides a distinct evidentiary trail that leads to the same destination, evidence of guilt. *See, e. g., United States v. Castellana*, 5 Cir. 1974, 488 F.2d 65, 67, *rev'd on other grounds en banc* 1975, 500 F.2d 325; *United States v. Holsey*, 10 Cir. 1970, 437 F.2d 250, 253, *cited in United States v. Marder*, 5 Cir. 1973, 474 F.2d 1192, 1196; *United States v. Barrow*, 3 Cir. 1966, 363 F.2d 62, *cert. denied* 1967, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541.

The attenuation exception does not apply here, either. That exception comes into play when there is "an independent act sufficient to break the causal connection between the alleged primary illegality and the evidence found as a result of the second search and admitted at trial". *United States v. Fike*, 5 Cir. 1971, 449 F.2d 191, 193. *See Parker v. Estelle*, 5 Cir. 1974, 498 F.2d 625, 630. Here, the discovery of the contraband occurred almost immediately after the illegal stop. No independent act, such as a decision by a witness to testify or not to testify, intervened. *Cf. United States v. Marder*, 5 Cir. 1973, 474 F.2d 1192, 1196; *United States v. Strickland*, 5 Cir. 1974, 493 F.2d 182, 186–87. The second car's u-turn was not an independent act, but a direct result of the illegal stop of the first car—if we are to believe the majority's hypothesis that the load car turned around because the lead vehicle signaled it.

The only exception to the fruit of the poisonous tree doctrine that might apply in this case is the "inevitable discovery" exception. This third exception allows the fruit of the poisonous tree to be admitted into evidence if the prosecution can show that the fruit would have been found eventually without the government's illegal act.

---

4. It is clear that the agents were going to stop the second vehicle in any event. *See* quotations from agent Wilson quoted in the text. I find that no reasonable suspicion to search

*either* car arose from the fact that they were traveling in tandem between 6:30 and 7:00 a. m.

If this Court recognized the "inevitable discovery" exception, the government could attempt to show that it would have had reasonable suspicion to stop the load car without having stopped the appellants' pickup. It would have had difficulty in doing so, because the facts in this case that would have been available to the government without the illegal stop are far less suspicious than those we found to justify a stop in *United States v. Barnard,* 5 Cir. 1977, 553 F.2d 392. But this Circuit has unambiguously rejected the inevitable discovery rule. *United States v. Houltin,* 5 Cir. 1976, 525 F.2d 943, 949; *Parker v. Estelle,* 5 Cir. 1974, 498 F.2d 625, 629–30 n.12, *cert. denied* 1975, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450; *United States v. Castellana,* 5 Cir. 1974, 488 F.2d 65, 68, *rev'd on other grounds en banc* 1974, 500 F.2d 325. *Contra, United States ex rel. Owens v. Twomey,* 7 Cir. 1974, 508 F.2d 858, 865–66.

We rejected the inevitable discovery rule because it requires speculation by the Court as to what would have happened had the illegality not occurred. It requires no speculation, however, to say that the agents meant to stop both vehicles traveling north on Highway 118 on the morning in question with only the vehicle's presence to provoke their suspicion. Agent Wilson testified as follows:

Q [Ms. Sloan] [A]t the time that you sent them [agents Newberry and Whittington] out to set up that stopping point, the two vehicles [the load vehicle and the lead vehicle] that were traveling on the road at that time were the two particular vehicles that you intended for them to stop, is that correct?

A I believe they are.

. . . . .

Transcript at 68.

Q [Mr. Childs] . . . I take it that you all discussed this situation that had been reported to you, that two cars were traveling north on Highway 118?

A Yes, sir.

Q And then you determined that you would go out on the Highway 118 and intercept the two cars, is that right?

A Yes, sir.

Transcript at 90–91.

Q Can we sum up your testimony so far like this: That at the time you received this call from Mr. Spencer, who is monitoring the sensors and the tape, that you deliberately set out on a pre-determined course to intercept these two vehicles and check them out?

A Yes, sir.

Q That's exactly what you did, didn't you?

A Yes, sir.

Transcript at 105.

The purpose of the exclusionary rule is to discourage future illegal conduct by government officers. *See, e. g., United States v. Calandra,* 1974, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561, 571. If the fruit of the poisonous tree doctrine did not exclude this evidence, Border Patrol officers would be encouraged to make illegal stops on the leading vehicles in every group apparently traveling together. They could use any suspicious information gained in the illegal stops of the leading vehicles to stop trailing vehicles and to convict the occupants of all the cars. To allow such a result would be to ignore Justice Holmes's statement about the exclusionary rule in *Silverthorne Lumber Co. v. United States,* 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319. The essence of the rule is not only "that . . . evidence so acquired shall not be used before the Court but that it shall not be used at all".

In sum, I would hold that the Border Patrol officers did not have enough information reasonably to suspect and to stop the vehicle containing Villarreal and Martinez. The later discovery of contraband must fail as the fruit of the illegal stop of their vehicle. *Frisbie* should be squarely faced, not bypassed. I regard it as controlling in this case and in *Almand.*