**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Stephen Allan LEWIS, a/k/a "Buddy", Defendant-Appellant.**

**No. 80–5543.**

United States Court of Appeals, Eleventh Circuit.

May 17, 1982.

Theodore Klein (Court-appointed), Joseph H. Serota, Miami, Fla., for Califano and Lewis.

Linda L. Carroll, Asst. U. S. Atty., Miami, Fla., Janis H. Kockritz, Appellate Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before MORGAN, KRAVITCH and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge:

On April 16, 1979, a person using the name "John Neal" placed a telephone call to Donald Jones, a free-lance pilot, in San Antonio, Texas. The caller left a message with Jones' parents for Jones to call him at a Miami telephone number. Jones returned the call and the phone was answered by a

man identifying himself as "John Neal." Later, during the trial, Jones identified the voice of "John Neal" as that of Nino Califano.[1] Califano explained that he was looking for someone to pilot a DC–3 on a 24-hour mission and that he had sent Jones, in the name of "John Miller," round trip air fare and $1,000.00 in expenses to come to Miami to discuss a proposition. The next day, Califano again called the Jones' house in San Antonio and left a message instructing Jones to go to Continental Airlines in San Antonio to pick up the ticket for the flight to Miami. Continental Airlines refused to give Jones the ticket because he could not identify himself as John Miller. Jones called Califano back on April 18, 1979, explained the situation, and subsequently picked up a prepaid one-way ticket to Miami in his own name. He flew to Miami on April 24, 1979. Prior to his flight, however, Jones contacted the Drug Enforcement Administration (DEA) in San Antonio and informed them that Califano's proposal sounded suspiciously similar to an earlier smuggling operation involving Jones. As a result of this tip, Agent Charles Overstreet, a pilot himself, agreed to pose as Jones' co-pilot and meet him in Miami.

Upon arrival in Miami, Jones and Overstreet met Califano and he informed them that they would be required to take a lie detector test before they would be included in any discussions. The purpose of the lie detector test was to determine whether Jones and Overstreet were government agents or informers. Although they concealed their true identity, both men passed the test.[2] Over the course of the next few days, Jones and Overstreet participated in a series of meetings with Califano and other conspirators to plan the upcoming criminal enterprise. Jones and Overstreet were to

fly a DC–3 aircraft carrying a load of marijuana from Colombia, South America to a yet undisclosed place in Florida. At a subsequent session the appellant, Stephen Allan Lewis, joined the discussion and revealed that the landing site in Florida was located on his property. Lewis also mentioned that he too had been required to take a polygraph test. Lewis escorted the pilots to the landing site where the men conferred on needed repairs and safety measures. The site turned out to be little more than a rutted cow path on Lewis' rural property. Lewis explained that a light aircraft had crashed at the site in a previous attempt to smuggle marijuana. Several bales of marijuana—visible reminders of this past mishap—were seen lying around the field. Ostensibly because of difficulties in Colombia, the mission was first postponed and then cancelled.

On May 22, 1979, a grand jury for the Western District of Texas indicted Lewis, Califano and four co-defendants for conspiracy to import marijuana into the United States in violation of 21 U.S.C. §§ 952(a), 963. The defendants filed motions to dismiss the indictment, alleging that the grand jury in the Western District of Texas did not have subject matter jurisdiction over the offense. Califano also moved for a change of venue to the Southern District of Florida on the grounds that transfer was necessary in order to make practical arrangements for his defense. After a hearing in August, 1979, the United States District Court for the Western District of Texas denied the motion to dismiss the indictment but granted a transfer to the Southern District of Florida for the convenience of the parties. After a jury trial in that district, Lewis and Califano were found guilty as charged. Lewis now appeals that

---

1. Nino Califano was one of the original appellants in this court, but died during the pendency of the appeal. Accordingly, a panel of this court dismissed the appeal as being moot as to Califano and directed the district court to vacate the judgment and dismiss the indictment as to him. *See United States v. Pauline*, 625 F.2d 684 (5th Cir. 1980).

2. The test was administered by Bud Wilson, an experienced polygraph examiner. Wilson, who was tried along with Califano and Lewis and was acquitted, testified that the two subjects' body movements had made the results of the examination inconclusive, but that he told Califano that the pilots were "clear" because of his suspicions concerning Califano's business and his desire that no one, including himself, get hurt. Record, Vol. VIII at 679.

conviction. Finding no error in the district court proceedings, we affirm.

Lewis first contends that the district court erred in denying the motion to dismiss the indictment because venue was not properly laid in the Western District of Texas. Venue is proper in any district in which the offense was committed, F.R. Crim.P. 18; 18 U.S.C. § 3237(a), and the offense of conspiracy is "committed" in any district in which an overt act is performed in furtherance of the conspiracy. *E.g. United States v. Strickland*, 493 F.2d 182 (5th Cir.), *cert. dismissed*, 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1974). The government need prove facts supporting venue only by a preponderance of the evidence. *United States v. De Leon*, 641 F.2d 330 (5th Cir. 1981); *United States v. Martinez*, 555 F.2d 1248 (5th Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 404, 54 L.Ed.2d 282 (1977). Here, the evidence discloses that Califano made a telephone call from Florida to Jones in San Antonio in order to arrange a meeting to plan the conspiracy. In addition, Califano provided for an airline ticket to be sent to Jones in San Antonio. Lewis argues that because Califano remained in Florida, he could not have committed an act in Texas. We disagree. In *United States v. Strickland*, 493 F.2d 182, 187 (5th Cir. 1974), *cert. dismissed*, 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1975), the Fifth Circuit Court of Appeals held that the prosecution was properly initiated in Atlanta because "telephone calls and conversations to and from Atlanta" were overt acts sufficient to establish venue. While the government here does not rely on any calls made from San Antonio, we agree that where a criminal conspirator commits an act in one district which is intended to further a conspiracy by virtue of its effect in another district, the act has been committed in both districts and venue is properly laid in either. *Accord, United States v. Spiro*, 385 F.2d 210 (7th Cir. 1967).[3]

Lewis next urges that he was denied his right to a thorough cross-examination because of Jones' refusal to answer questions relating to the amount of payment Jones received from the C.I.A. for services allegedly rendered after his involvement in this case. The exchange between Jones and the defense attorney transpired as follows:

Q. Out of the $30,000 you made last year, how much came from the United States Government?

A. DEA, none, sir.

Q. I did not ask that.

A. Call the CIA in Washington, D. C. and they will tell you.

MR. GOODHART: May we have an instruction that he must answer the questions.

THE COURT: I am not sure he is at liberty to answer the questions.

THE WITNESS: I am not, your Honor.

Q. [By Mr. Goodhart] You are not or you won't?

A. I am not at liberty.

Q. Why?

A. I am not at liberty to answer that either.

Record, Vol. VII at 222, 223. The focus of the examination was then promptly changed to Jones' work as an informant in other cases. Lewis now asserts that the trial court's refusal to compel Jones to answer was a prejudicial restriction on the defendants' attempt to show that Jones was biased because of his financial dependence on the government. While a defendant has a constitutional right to a thorough and sifting cross-examination to facilitate impeachment, the scope of a hostile witness' examination is within the sound discretion of the trial court. *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956

---

**3.** We disagree with Lewis' analogy to *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). There, the court was confronted with a case in which federal jurisdiction was provided solely by interstate telephone calls made by federal undercover agents. The controversy here concerns venue rather than jurisdiction and federal authorities did not orchestrate the phone call in order to lay the groundwork for venue in Texas. The appellant's reliance on *Archer* is misplaced.

(1968); *United States v. Hughes*, 658 F.2d 317 (Former 5th Cir. 1981). Furthermore, a conviction will not be reversed on appeal if defense counsel was allowed to achieve his desired purpose despite specific restrictions by the trial court which are claimed to constitute error. *See United States v. Hughes*, 658 F.2d 317 (Former 5th Cir. 1981). We begin by noting that Lewis did not request a *voir dire* examination of Jones. The trial judge's statement that he was "not sure [Jones] is at liberty to answer the questions" can hardly be taken as a refusal to permit a hearing outside the presence of the jury, but was instead an open invitation for a motion for that purpose. Because no issue was made at the trial of the validity of the national security privilege implicitly claimed by Jones, our standard of review is that of plain error. F.R.Crim.P. 52(b). No such error existed here. Jones' testimony made it clear enough that he received some money from the C.I.A. Furthermore, the defense was successful in its efforts to impeach Jones' character. On cross-examination, Jones admitted that he had been convicted of drug charges, that he was still on probation, that he was a part time employee of the federal government, that he had omitted facts from his written statements, that he had lied twice while under oath during the trial and that he was such an accomplished liar that he had deceived a lie detector machine. Record, Vol. VII at 209, 218, 219, 225, 228, 230. The jury's decision to believe Jones was undoubtedly influenced by the fact that the great bulk of his testimony was corroborated by Agent Overstreet of the DEA. Considering these facts, we find it difficult to believe that Jones' credibility could have been any more thoroughly impeached by a showing of the amount of compensation he received from the C.I.A. Because the defense succeeded in impeaching Jones' character, the restriction on the cross-examination, if any, was not prejudicial. *See United States v. Hughes*, 658 F.2d 317 (Former 5th Cir. 1981).

Finally, Lewis maintains that the evidence was insufficient to support his conviction. As pointed out earlier, Califano required Lewis to take a polygraph test to determine whether he was an informant or policeman. Record, Vol. VII at 65. In addition, Lewis showed the proposed landing strip to the pilots and discussed improvements required to make the area safe for the landing of a DC–3. Record, Vol. VII at 136. Lewis also acknowledged that the landing strip had been "used before" when a Cessna 310 airplane loaded with marijuana made an unsuccessful attempt to land. Record, Vol. VII at 135. Several bales of marijuana were lying near the landing strip when Lewis showed the area to the pilots. The "landing strip" was not regularly used for air traffic but was actually little more than a "cow pasture road" with water holes and deep ruts which would make landing an airplane dangerous. Record, Vol. VII at 135. Moreover, when Jones emphasized that the unloading crew must be kept at a safe distance until the risky landing had been accomplished, Lewis replied that "he would insure that it was taken care of." Record, Vol. VII at 137. During oral argument, defense counsel admitted that it was reasonable to infer that Lewis suspected that "something improper was going on," yet Lewis insists that there is no evidence to show that he knew of the object of the conspiracy. Specifically, he argues that it is reasonable to infer that he did not know that the imported substance would be marijuana.

To sustain a conviction for importation of a controlled substance it need not be proved that the defendant had knowledge of the particular drug involved, but only that he is importing some controlled substance. *United States v. Restrepo-Granda*, 575 F.2d 524 (5th Cir.), *cert. denied*, 439 U.S. 935, 99 S.Ct. 331, 58 L.Ed.2d 332 (1978); *United States v. Jewell*, 532 F.2d 697 (9th Cir.), *cert. denied*, 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976); *United States v. Zapata*, 497 F.2d 95 (5th Cir. 1974). It is not necessary then, to decide whether Lewis knew that the proposed cargo would be marijuana, but only whether the jury could infer that Lewis voluntarily joined a conspiracy to import some controlled sub-

stance. At the very least, Lewis knew that the landing strip had been used in prior attempts to smuggle marijuana. Furthermore, the required polygraph examination and the remote and dangerous landing site lent emphasis to his awareness that the enterprise had an illegal objective. Lewis also indicated that he would either be present for the unloading operation or instruct those who would be there. Here, as in *United States v. Alvarez*, 625 F.2d 1196 (5th Cir. 1980) (*en banc*), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981), the evidence discloses that the appellant knew that criminal activity was afoot, intended to be involved with the unloading operation and sought to reassure others connected with the plot. The fact that Lewis was given a polygraph examination to determine whether he was a government agent makes the evidence in this case more convincing than that presented in *Alvarez*. In light of all the evidence, we do not agree with Lewis' contention that the jury could reasonably have found that he thought that the object of the conspiracy was to import "bales of cotton or some other legal substance."

For the foregoing reasons, the conviction is

AFFIRMED.